**In re GENERAL DEVELOPMENT CORPORATION, et al., Debtors.**

**Bankruptcy No. 90–12231–BKC–AJC.**

United States Bankruptcy Court, S.D. Florida.

Nov. 18, 1992.

Lynn Gelman, Miami, Fla., Asst. U.S. Trustee.

William J. Perlstein, Wilmer, Cutler & Pickering, Washington, D.C., Mark D. Bloom, Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, P.A., Miami, Fla., for debtors.

## MEMORANDUM OPINION AND ORDER ESTABLISHING FIXED MARKET RATE OF INTEREST ON ALLOWED SECURED PROPERTY TAX AND DEFERRED PRIORITY CLAIMS AGAINST GENERAL DEVELOPMENT CORPORATION

A. JAY CRISTOL, Bankruptcy Judge.

THIS MATTER came before the Court at a hearing on May 26, 1992, upon this Court's Memorandum Opinion On Objections Of The County Tax Collectors (the "Memorandum Opinion"), entered on December 20, 1991, and this Court's Order (the "Confirmation Order"), 135 B.R. 1008 (Bkrtcy.S.D.Fla.1991), Confirming Restated Second Amended Joint Plan of Reorganization (the "Joint Plan")[1] of General Development Corporation ("GDC"), entered on March 27, 1992. The Memorandum Opinion directed that a hearing be held to establish the appropriate fixed, market rate of interest for allowed prepetition secured property tax claims in Class 2.3 of the Joint Plan (the "Secured Tax Claims"). The Confirmation Order directed that a hearing be held to establish the appropriate fixed, market rate of interest for allowed deferred priority claims in Classes 3.1, 3.3 and for Priority Tax Claims (as defined in the Joint Plan) (collectively, with claims in Classes 3.1 and 3.3, the "Deferred

---

1. The Joint Plan became effective on March 31, 1992 (the "Effective Date").

Claims"). For the reasons stated below and in the Memorandum Opinion, the Court finds that the proper fixed market rate of interest on allowed Secured Tax Claims shall be *9.25%*, the proper fixed market rate of interest on allowed Deferred Claims other than the Priority Tax Claims is *9.25%*, and the proper fixed market rate of interest on the Priority Tax Claims is *9.25%*.

The court has listened to various moans and wails crying out against the court adjusting the contracts of various purchasers of Tax Certificates on property of this Debtor.

■ The court has previously determined that it has the power to modify the interest rate to be paid to persons who purchased Tax Certificates in various counties throughout the State of Florida. In the Memorandum Opinion, this Court has already considered and overruled the objections of certain county tax collectors and GDC tax certificate holders (collectively, the "Tax Collectors") to the treatment of Secured Tax Claims under the terms of the Joint Plan. The Joint Plan, as modified by the Confirmation Order, provides that the holders of allowed Secured Tax Claims, which include both tax collectors and certificate holders, will receive deferred payments of their claims in ten semiannual payments with interest accruing from the Effective Date at "such rate of interest as may be required by Section 1129(b)(2)(A)(i)(II) of the Bankruptcy Code." The Tax Collectors objected to that provision of the Joint Plan, arguing that the appropriate rate of interest on Secured Tax Claims after the Effective Date would be the state statutory rate of 18% per annum (or such lower interest rate as may have been bid by the certificate holder).

Based on the Eleventh Circuit's decision in *In re Southern States Motor Inns, Inc.,* 709 F.2d 647 (11th Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984) and other cases cited in the

Memorandum Opinion, and because the statutory rate is unrelated to market forces, this Court concluded that the statutory rate of 18% provided for by Chapter 197 of the Florida Statutes is irrelevant to the determination of the appropriate interest rate on Secured Tax Claims.[2] Instead, this Court ruled that the appropriate rate would be a market rate for a comparable "loan" of a term equal to that of the payout period on Secured Tax Claims, and that the appropriate rate should be a fixed interest rate. Because the only testimony presented prior to entry of the Memorandum Opinion dealt with floating rates of interest, the Court scheduled a hearing to establish the proper fixed rate of interest. The only issue now before the court is whether the court should exercise its power to modify such interest rates and how.

## DISCUSSION

■ When Congress enacted the Bankruptcy Code, it created the power to modify interest rates applicable against the Internal Revenue Service as well as against all other taxing authorities and parties purchasing Tax Certificates through taxing authorities. The Court deems it appropriate to take a few moments to discuss its reasoning in lay terms in order to explain how it justifies exercising this power. Perhaps, some of those persons affected thereby will understand that this decision leaves them no worse off than they were and, perhaps, somewhat better off.

First, we must consider the nature of a Tax Certificate. When one invests, the interest rate associated with an investment is usually directly related to the risk involved. Thirty-day United States Treasury Notes usually have a much lower return than thirty year Treasury Bonds, the highest interest rate generally being reserved for the highest risk.

Q: Why then is 18% available on some Tax Certificates?

certificate sales process, which already were considered and rejected in the Memorandum Opinion, are rejected again at this time.

---

**2.** For this reason, the arguments raised by The Florida Tax Collectors, Inc. and the Tax Collectors that seek to tie the interest rate on Secured Tax Claims to the 18% statutory rate and the tax

A: A buyer of Tax Certificates who believes that they are the quality of government notes, bills or bonds is misinformed. If a Tax Certificate is acquired at the 18% rate and all goes well, the buyer will receive the return of the investment plus 18% until the time the Certificate is paid. A Tax Certificate is paid when the delinquent taxpayer redeems the Tax Certificate or some other interested party redeems it for them.

Q: What happens if the certificate is not redeemed?

A: Well, first of all, if it is not redeemed and no action is taken upon it by the holder for a period of seven years, the certificate expires and is of no further value whatsoever. Fla.Stat. § 197.482 (1991).

Q: Is there a way that a taxpayer can protect against that eventuality?

A: Yes there is. After holding a Tax Certificate for two years, the law provides that a taxpayer may apply for a Tax Deed. Fla.Stat. § 197.502(1) (1991).

Q: What does that entail?

A: The procedural aspects are handled through the Office of the Clerk of the Circuit Court. If any other taxes are outstanding and have accrued against the property, (and usually there are and usually they are accruing at 18% interest), the certificate holder must pay these taxes in full prior to the tax sale together with the various costs and charges which the Clerk assesses. Fla.Stat. § 197.502(2) (1991). Now having made this additional investment, the certificate holder may go to the sale and bid for the property. If lucky, someone may overbid the certificate holder and will acquire the property with a certificate holder receiving the return of all cash invested so far. This might happen when the property is desirable or valuable or when some interested party decides to redeem it although they may not let it go this far. In the absence of other bids, a Tax Deed is issued to the certificate holder. Fla.Stat. § 197.542 (1991).

Q: Once a Tax Deed is issued to the Certificate holder, they are now the owner in fee simple of marketable title of record to the property covered by their Tax Certificate, right?

A: Wrong. Having acquired the title under the Tax Deed, they must hold the property for twenty years in order for it to mature into marketable title of record. If the certificate holder [who now possesses the deed] does not wish to wait the twenty years, they may file a suit to quiet title to their property acquired by Tax Deed. *See Stuart v. Stephanus,* 94 Fla. 1087, 114 So. 767 (1927). This will involve a time delay of three to nine months, depending on how many parties need to be served with service of process in the quiet title suit. If there are parties with addresses unknown or possibly deceased or possibly incompetent or possibly minors, it may be necessary to appoint a guardian ad litem, attorney ad litem, and/or administrator ad litem at an additional expense of perhaps $500 to $1,000 or more. This is added to the court costs for the suit and the legal fees of $500 to $1,500 (in complicated cases, perhaps more).

Q: But if a certificate holder holds two certificates, they may quiet title in the same lawsuit, right?

A: Possibly, but in many instances and in many counties, it will be necessary to bring separate lawsuits for each individual certificate.

Q: So now the certificate holder has acquired title to a piece of property in which there has been invested the additional delinquent taxes, the Clerk's fees and either the quiet title suit or a twenty year wait. How is that parcel converted into cash?

A: It seems likely that if there was a market for the property and interested buyers, they would have bought at the Tax Deed sale. A broker could be used to sell the land but they charge a commission. On a transaction involving vacant land, the brokerage and costs of sale should run ten or fifteen percent of the gross.

Perhaps the particular Tax Certificates which have been the subject of much wailing and gnashing of teeth, do not look as

good now as they did before reading and verifying this information.

Like eggs and like apples, some are of excellent quality and some are rotten, with varying degrees in between. If a particular Tax Certificate is on a developed property, in use, and of great value to an owner, who is financially able to redeem Tax Certificates against same, then that is a Tax Certificate of good quality. These Tax Certificates which will probably be paid about the time of Tax Deed applications. If, on the other hand, a particular Tax Certificate was of the rotten quality, with no market for the real estate and no owner or other interested party likely to redeem the certificate, then the chances of payoff are small.

Q: How do the General Development Corporation Tax Certificates fit in to the general scheme of things?

A: When they were offered for sale, General Development Corporation was thought to be a financial giant, making money hand over fist and daily trading its shares on the New York Stock Exchange. At the time of purchase, the certificates appeared to be among the better quality certificates. But that analysis has been overcome by events. The General Development Corporation empire collapsed. The stock was delisted from the New York Stock Exchange and became worthless. Investors in General Development Corporation stock lost millions of dollars. Their concern became, to quote Will Rogers, "... not in the return *on* their money but the return *of* their money". In both cases, they scored zero. Numerous other investors, lenders and creditors of General Development Corporation have received no return on their money and only a partial return of their money. The certificate holders might well have been in the category of other General Development Corporation creditors; and, after going through the Tax Deed procedure and ultimately selling the property acquired, if it could be sold, they might have had a net loss on their investment rather than a return thereon. If the company had not been reorganized, 93,000 acres of General Development Cor-

poration land would have been out there in the marketplace and there is no market for it at the present time. Certificate holders who acquired their Tax Deeds, upon payment of the expenses indicated herein, would then hold title to tracts of land and would be in competition with each other to see if they could sell a piece here and there to someone who might have come along. Instead, the reorganization provides a vehicle, now in the hands only of creditors whose interest is to maximize the return produced by General Development Corporation and who, if successful, will provide the full return of each certificate holder's capital plus a market rate of interest on that investment.

Q: And if the reorganization does not work?

A: Then the Certificate holders will have received the return of some of their capital plus some interest at a market rate and the remainder of their investment will revert to their original posture and be left unimpaired. In fact, rather than impaired, their position will be enhanced as it will revert to their original position with a smaller investment outstanding and, thus, a smaller risk and a better chance of receiving the return of their money.

It is the conviction of this court that the power granted by Congress to make the adjustments provided by this order, should be exercised in this case in both the best interest of the entire body of creditor communities generally as well as in the specific interest of the class of Tax Certificate holders.

It is noted that although this case has hundreds of thousands of potential claimants and community after community of creditor bodies, every creditor community came on board the plan of reorganization except the various county taxing authorities and a number of Tax Certificate purchasers. It is understandable that the taxing authorities are interested in their own goal of bringing revenue into the county treasuries and the certificate buyers are interested in maximizing their return on their capital. It is the opinion of this court that taxing authorities are not entirely can-

did with their tax certificate buyers and, if required to issue a prospectus under S.E.C. regulations before conducting a tax certificate sale, they would probably not be able to sell a single certificate. Likewise, the court believes that its analysis of the quality of these Tax Certificates has been proven by the fact that although they were quite popular when General Development Corporation was a big dog, testimony indicates that, in the years following the collapse, almost no Tax Certificates on General Development Corporation property were purchased by any certificate buyer.

It is hoped that this explanation is understandable to the lay persons who may read it. The court will now devote some attention to the legalese portion of opinion.

## I. SECURED TAX CLAIMS

■ The principal litigants agree that the standard established in *In re Southern States* is controlling here. Thus, in determining the appropriate interest rate, the Court is to consider the prevailing market rate on the Effective Date for a loan with similar payment terms and with due consideration of the quality of the security, and the risk of default. *Id.* at 651. The disagreement of the litigants over the proper interest rate stems from the very different loans that each would select as "similar" to the forced "loan" made to holders of allowed Secured Tax Claims.

Under the terms of the Joint Plan, Secured Tax Claims retain a first priority lien in the underlying real property to secure their repayment. In the event that the Reorganized Debtor defaults in any payments owing to a holder of a Secured Tax Claim, the creditor may foreclose on or otherwise enforce the lien. In addition, this lien is ahead of all other liens that remain on the property after the Effective Date, including the liens of the Reorganized Debtor's post-confirmation lenders. The litigants disagree on what should constitute a loan with an equal payout term. The "quality of the security" provided to holders of Secured Tax Claims and would

appear to disagree on the "risk of default" as well.

*Risk of Default.* In December of 1991, in a memorandum opinion containing the necessary findings of fact and conclusions of law to confirm a plan under Section 1129 of the Bankruptcy Code, and again in the Confirmation Order, this Court has ruled that the Joint Plan meets the "feasibility" requirement of Section 1129(a)(11). Therefore, the Court finds that the risk of payment default on the Secured Tax Claims is small. This is particularly so in light of the relative priority that holders of Secured Tax Claims have over all other creditors, principally the Reorganized Debtor's post-confirmation lenders.

*Term of Loan.* Kathleen D. Durdin, the Court-appointed Examiner, who was called at the hearing by the Reorganized Debtor as an expert witness, is of the opinion that, with respect to identification of a similar loan term in the market place, the "loan" provided to holders of Secured Tax Claims has an effective term of 37 months. The Examiner points out that while holders of Secured Tax Claims will be paid out over five years, each semiannual payment will contain 10% of the original outstanding "principal" amount of the loan. This is in contrast, for example, to five-year U.S. Treasury notes, which pay all principal and interest at the maturity of the note. In essence, the Examiner concludes, holders of Secured Tax Claims have ten separate loans with ten separate terms that mature, with interest due, every six months. The weighted average maturity of the ten separate loans is 37 months. United States Sugar ("US Sugar") contends that a more appropriate comparable term would be those of 15– and 30– year mortgages, apparently because it believes such loans are the only fixed-rate loans secured by real property available in the marketplace.[3]

■ The Court finds that the Examiner's testimony is more persuasive and holds that for purposes of establishing the proper rate of interest, the Court will look at

---

**3.** The Court notes that the Examiner included an analysis of collateralized mortgage obligations with maturities similar to those of the Secured Tax Claims.

debt securities in the market having maturities of approximately 3 years. Marketplace debt having maturities from 5 to ten times longer than the Secured Tax Claims, which is suggested by US Sugar, is not fairly comparable. Furthermore, in light of the small risk of default and the overall quality of the security (see below), the Court concludes that it is appropriate to consider not only loans secured by real property but other loans such as government securities and to make appropriate adjustments.

Quality of the Security. With respect to the quality of the security, the Examiner urges on behalf of the Reorganized Debtor that the property securing the Secured Tax Claims is of higher quality than virtually any other in this case. She notes initially that the value of the property securing such claims is likely to be at least 5 to 10 times that of the underlying claim, since the taxes were assessed at only a small fraction of the value of the property.

Furthermore, the fact that the Reorganized Debtor's post-confirmation financing is secured by the same property enhances the quality of the Secured Tax Claims holders' security for at least two additional reasons. First, the Reorganized Debtor must make all payments to holders of Secured Tax Claims or face the risk of an event of default under the terms of that financing. Second, in the unlikely event that the Reorganized Debtor does fail to make a payment to a Secured Tax Claim holder, its lenders are likely to make the payment in order to preserve their collateral. This collateral secures not only the $50 million Term Loan (and the $20 million working capital facility), but also approximately $46 million of secured floating rate notes issued to these same lenders. In light of the lenders' second priority lien on this property to secure their financing to the Reorganized Debtor, the Court does not find the argument that the property would be hard to liquidate for purposes of enforcing the liens persuasive or compelling.

The Examiner reviewed numerous different types of securities in the market, and made appropriate adjustments in light of the *Southern States* criteria to come up with an overall blended rate of interest to recommend as the fixed market rate to apply to the Secured Tax Claims. First, she considered to be without risk U.S. Treasuries with maturities of 1 year (4.50% per annum), 2 years (5.50% per annum) and 5 years (7.00% per annum), and collateralized mortgage obligations (1—1.25% over Treasuries of similar maturities). She then analyzed the prime rate, the benchmark for corporate clients (6.50% per annum), medium-and high-quality corporate bonds of similar terms (6.327%—8.122% per annum), and the Merrill Lynch indices of medium and high grade bonds of 1 to 10 years (7.69%—8.16% per annum) in comparison to high risk "junk" bond rates (11.83% per annum). Finally, Ms. Durdin considered the interest rates applicable to other debt instruments of the Reorganized Debtor, both secured and unsecured (ranging from prime + 1% to 13% per annum). After considering the risk of nonpayment, quality of the security and the term of the "loan" made to holders of Secured Tax Claims, the Examiner recommended a fixed market rate of interest on the Secured Tax Claims of 7.25% per annum.

## II. DEFERRED CLAIMS

Because holders of Class 3.1 claims voted to accept the Joint Plan, allowed priority wage claims (up to $2,000 per individual pursuant to Section 507(a)(3) of the Bankruptcy Code) in Class 3.1 under the Joint Plan are to be paid in cash in four equal semi-annual installments of principal and interest, beginning on the first Payment Date (as defined in the Joint Plan) after a final order allowing such claims. Similarly, allowed priority deposit claims (up to $900 per individual for deposits on houses that were not delivered pursuant to Section 507(a)(6) of the Bankruptcy Code) in Class 3.3, which voted to accept the Joint Plan, are to be paid in cash in four equal semi-annual installments of principal and interest. Allowed priority tax claims (pursuant to Section 507(a)(7) of the Bankruptcy Code) (the "Priority Tax Claims") are treated by the Joint Plan in accordance with Section 1129(a)(9)(C) of the Bankruptcy

Code, which permits deferred payments in cash in equal semi-annual installments of principal and interest so long as the total amount is repaid prior to the sixth anniversary of the date of assessment of the tax. Since all priority tax claims against GDC were assessed prior to April 6, 1990, the deferred payments must be completed by April 1996, which is four years from the Effective Date.

■ As in the case of Secured Tax Claims, the Joint Plan provides for the payment in full over time of all Deferred Claims, together with such interest as is necessary to ensure that the holders of allowed Deferred Claims receive an overall recovery the present value of which is equal to the allowed Deferred Claim. In setting an appropriate fixed market rate of interest on the Deferred Claims, *Southern States* and other cases make clear that the applicable standards of review are the same as those for the Secured Tax Claims: the term of the loan, the risk of default or likelihood of payment, and the quality of the security.[4]

The Examiner testified as an expert on behalf of the Reorganized Debtor with respect to the appropriate rate of interest on the Deferred Claims. No other testimony on this issue was presented by any other party. The Court finds the Examiner's testimony to have been persuasive, and that she focused on the proper indices in arriving at a recommended interest rate on the Deferred Claims.

With respect to the term of the "loans" constituting the Deferred Claims, the Examiner states that, using the same methodology applied to the Secured Tax Claims, the weighted average term of the Deferred Claims other than the Priority Tax Claims is approximately 1.58 years. The weighted average term of the Priority Tax Claims is 2.08 years. With respect to the risk of default or the likelihood of nonpayment, the Examiner properly relied upon this Court's feasibility determinations in confirming the Joint Plan to assess the risk as small. With respect to the quality of the security, the Deferred Claims are unsecured. After reviewing the same types of debt instruments that she analyzed with respect to the Secured Tax Claims, and making adjustments for the substantially shorter term, as well as the Court's retained jurisdiction and the lack of security, the Examiner recommends a blended rate of interest on the Deferred Claims other than the Priority Tax Claims of 7.0% per annum, and a blended rate of interest of 7.25% per annum for the Priority Tax Claims.

Finally, while the Deferred Claims are not secured, the Court notes that payment of the Deferred Claims remains subject to the jurisdiction of this Court, and the Court will not tolerate the Reorganized Debtor's failure to make any such payments.

## CONCLUSION

One final point should be made. In the overall context of the GDC bankruptcy, holders of Secured Tax Claims and Deferred Claims are already among the most fortunate creditors. In a case where general unsecured creditors will be receiving only a fraction of the value of their allowed claims, holders of Secured Tax Claim and Deferred Claims are receiving not only payment in full, but with interest. Each of the various Unsecured Classes under the Joint Plan has compromised in order to permit the rehabilitation of the Reorganized Debtor in an attempt to maximize the eventual recovery under the Joint Plan. The holders of Secured Tax Claims and Deferred Claims are entitled under Section 1129 to payment in full with interest, but are not

---

**4.** *In re Southern States,* 709 F.2d at 652 n. 6. Numerous provisions of the Bankruptcy Code require that applicable interest be determined in the same manner. *Compare* §§ 1129(a)(7)(B) (impaired nonrecourse secured claims), § 1129(a)(9)(C) (priority tax claims); § 1129(a)(9)(B)(i) (other priority claims); § 1129(b)(2)(A)(i)(II) (secured claims); and § 1129(b)(2)(B)(i) (unsecured claims). *See also*

*In re Camino Real,* 818 F.2d 1503, 1504 (9th Cir.1987) (§ 1129(a)(9)(C) analysis useful to courts in considering analysis of secured claims); *United States v. Neal Pharmacal Co.,* 789 F.2d 1283 (8th Cir.1986) (language of § 1129(b)(2)(A)(i)(II) virtually identical to § 1129(a)(9)(C) and analysis should be the same).

entitled to more, including double-digit interest rates of the sort they have sought in this proceeding. The money that the Reorganized Debtor needs for its operations, so important to the eventual recoveries of unsecured creditors, should not be used for a windfall to those whom the Bankruptcy Code has chosen to favor. For this reason, the fixed interest rates on the Secured Tax and Deferred Claims must be limited only to that which is due under the Code.

The Court therefore holds that the appropriate fixed market rate of interest on the Secured Tax Claims is the rate of interest on a high quality, low risk, secured loan with an approximate 3 year maturity, that the appropriate fixed rate of interest on the Deferred Claims other than Priority Tax Claims is the rate of interest on a medium quality, low risk, unsecured loan with an approximate 18 month maturity, and that the appropriate fixed rate of interest on the Priority Tax Claims is the rate of interest on a medium quality, low risk, unsecured loan with an approximate maturity of 2 years. Although acknowledging that the determination of an appropriate risk component may be somewhat arbitrary, the Court holds that an additional factor be added to the riskless rate. Therefore, the Court holds that the appropriate cramdown rate is 9.25%. Because the prime rate on the Effective Date was 6½%, and the rate on 2– and 5–year risk-free treasury securities were 5.5% and 7.0% respectively, the Court holds that the fixed market rate of interest on the Secured Tax Claims is *9.25%*, the rate on the Deferred Claims other than the Priority Tax Claims is *9.25%*, and the rate on Priority Tax Claims is *9.25%*.

DONE AND ORDERED.