**In re Delois HOLLINGER, Debtor.**

Bankruptcy No. 99–070277–TLH4.

United States Bankruptcy Court,
N.D. Florida,
Tallahassee Division.

Feb. 4, 2000.

Gregory Miller, Tallahassee, FL, for Creditor.

Allen Turnage, Tallahassee, FL, for Debtor.

Leigh Hart, Tallahassee, FL, trustee.

### MEMORANDUM OPINION

LEWIS M. KILLIAN, Jr., Bankruptcy Judge.

This matter came on for hearing on November 30, 1999 on the objection of the Creditor, Household Automotive Finance Corporation ("HAFC"), to confirmation of the Debtor's Second Modified Chapter 13 Plan. Having considered the limited evidence and arguments presented by both counsel, having reviewed the pleadings and related documents submitted in the cause, and based on additional research, I make the following Findings of Fact and Conclu-

sions of Law as required by Bankruptcy Rule 7052.

### *Facts*

On October 28, 1998, the Debtor entered into a security agreement with HAFC for the purchase of a 1999 Kia Sephia LS. Under this agreement, HAFC provided financing of $14,949.95 towards the purchase of the vehicle over seventy-two months at an annual interest rate of 16.78%. When the Debtor filed for bankruptcy on April 2, 1999, she owed HAFC $15,269.56.

As part of the Debtor's Second Modified Chapter 13 Plan, she valued the vehicle at $12,000.00 and proposed to pay the debt over five years at 10% interest per annum. On August 30, 1999, the value of the vehicle (and HAFC's security) was set at $11,900.00. HAFC objects to confirmation of the Plan, arguing that 10% interest does not provide the value of its claim as required by Bankruptcy Code § 1325(a)(5)(B)(ii). HAFC argues that it is entitled to the contract rate of 16.78% absent evidence that the Debtor (or a borrower with similar credit risk) could qualify for financing at a lower rate. At the hearing, HAFC produced the only evidence regarding the prevailing market rate; the Debtor produced no evidence other than proof of the interest rate on five-year treasury bills. A loan officer for HAFC, Rick Bianca, testified that HAFC bases its interest rate on the year of the vehicle and the credit worthiness of the debtor. He further testified that the lowest interest rate for which the Debtor would qualify is 16.78%. Although he could not provide the factors underlying this interest rate, he did state that this rate is similar to the rates of HAFC's competitors. At the time of the hearing,

the interest rate on a five-year treasury bill was 6.126%.

### *Discussion: Cram Down Interest Rate*

Since the value of the vehicle has already been set, the sole issue posed by HAFC's objection to confirmation is whether the market rate of post-confirmation interest on a secured claim in a Chapter 13 reorganization is best reflected by the contract rate or some other rate. HAFC argues that it is entitled to interest at the contract rate of 16.78% but the Debtor's Plan only provides for interest at 10%.

Section 1325 of the Bankruptcy Code provides

> [T]he court shall confirm a plan if . . . with respect to each allowed claim provided for by the plan . . . (i) the plan provides that the holder of such claim retain the lien securing such claim; and (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim[.]

11 U.S.C. § 1325(a)(5)(B) (West 1999–2000). This provision, often referred to as the Chapter 13 "cram down" provision, is meant to ensure that secured creditors who are required to accept deferred cash payments over time will receive the present value equivalent of their claims. *See Matter of Southern States Motor Inns, Inc.,* 709 F.2d 647, 650 (11th Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984) (discussing a Chapter 11 cram down on a priority tax claim); *cf.* 11 U.S.C. § 1129(a)(9) (using language virtually identical to § 1325(a)(5)(B)(ii)).[1] Thus, in theory, receiving the "present value" of its allowed claim places the creditor in the same economic position that it would

---

**1.** Chapter 11, Chapter 12, and Chapter 13 reorganizations all require debtors to provide creditors with "value, as of the effective date of the plan." *See* 11 U.S.C. §§ 1129(a)(9)(C), 1225(a)(5)(B)(ii); 1325(a)(5)(B)(ii). Previously in this court in *In re O'Farrell,* 74 B.R. 421,

424 (Bankr.N.D.Fla.1987), the *Southern States* holding was applied to Chapter 12 cases. Since the cram down language of the three chapters are so similar, there is no reason why *Southern States* should not also apply to Chapter 13 cases.

have been had it received the value of its allowed claim on the confirmation date. *See In re Valenti*, 105 F.3d 55, 63 (2d Cir.1997) (citations omitted).

The federal circuit courts agree that a creditor should receive interest at the market rate to obtain the present value of its claim. As stated by the Seventh Circuit Court of Appeals, "[m]arket rates of interest measure the real risks of nonpayment and the costs of collection (including the costs of foreclosure and bankruptcy proceedings); it is to these market rates, rather than lawyers' speculations about business operations, that judges must turn." *Koopmans v. Farm Credit Serv. of Mid–America, ACA*, 102 F.3d 874, 876 (7th Cir.1996). However, the circuits disagree on the proper method for determining the market rate. Some circuits hold that a cram down is essentially a "coerced loan" and thus the interest rate under the terms of the parties' contractual agreement (or a similar type of loan) is the proper measure of market rate. *See, e.g., General Motors Acceptance Corp. v. Jones*, 999 F.2d 63, 66 (3rd Cir.1993) (adopting the rebuttable presumption that the rate charged by that particular creditor best reflects the market rate); *Matter of Smithwick*, 121 F.3d 211, 215 (5th Cir.1997), *suggestion for reh'g en banc denied*, 132 F.3d 1458 (5th Cir.1997), *and cert. denied sub nom., Smithwick v. Green Tree Financial Servicing Corp.*, 523 U.S. 1074, 118 S.Ct. 1516, 140 L.Ed.2d 669 (1998) (adopting the *General Motors* rebuttable presumption); *United Carolina Bank v. Hall*, 993 F.2d 1126, 1130–31 (4th Cir.1993) (holding that the appropriate interest rate must reflect the creditor's costs and expenses in making loans in a similar area); *In re Hardzog*, 901 F.2d 858, 860 (10th Cir.1990) (applying the rate charged by similar creditors in the region); *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427, 431 (6th Cir.1982) (adopting the interest rate used for similar loans in the region). Other circuits endorse a "formula" method, applying the interest rate on risk-free investments such as United States Treasury notes and adding a risk premium specifically crafted towards the debtor.[2] *See Valenti*, 105 F.3d at 64; *United States v. Doud*, 869 F.2d 1144, 1145 (8th Cir.1989) (applying, but not specifically mandating, the formula method to a chapter 12 case); *In re Camino Real Landscape Maint. Contractors, Inc.*, 818 F.2d 1503, 1508 (9th Cir.1987) (adopting the formula method in a Chapter 11 case); *cf. Koopmans*, 102 F.3d 874 (applying the prime rate of interest plus a risk premium, but not mandating the formula method). A third approach used by some bankruptcy courts, the "cost of funds" method, grants the secured creditor interest on its claim at the rate at which that creditor borrows capital. *See Matter of Jordan*, 130 B.R. 185, 190 (Bankr.D.N.J.1991); *Matter of Campbell*, 16 B.R. 496, 497 (Bankr.N.D.Ill. 1982). This method has not been adopted by any federal circuit court, and was not supported by either party in the present case.

■■■ In the Eleventh Circuit, creditors who are to receive deferred payments are entitled to interest on their claims at the prevailing market rate. *See Southern States*, 709 F.2d at 652–53. However, this decision does not subscribe to any particular approach. In *Southern States*, the debt was a priority tax debt. The bankruptcy judge originally ruled that it would use the interest rate set out in § 6621 of the federal tax code[3] less 1% for the "re-

---

**2.** Some bankruptcy courts have gone a step further, setting a risk-free base rate and adopting a local rule to set a fixed risk premium for all Chapter 13 cases. *See* E.D. Mo. L. Bankr. R. 13–2(g) (applying the Wall Street Journal prime rate plus a 3½% risk premium); W.D. Mo. L. Bankr. R. 3084–1.E.4 (applying the 30–year treasury bond rate plus a 2% risk premium); N.D. Ala. Bankr. Admin. Order 97.1 (applying the New York prime rate plus a 1½% risk premium).

**3.** At the time of the *Southern States* decision, 26 U.S.C. § 6621 provided that the rate of interest on federal tax claims was determined by the Secretary.

habilitation aspects" of the plan, and the district court affirmed.

The court in *Southern States* began its analysis by citing to 5 COLLIER ON BANKRUPTCY ¶ 1129.03, at 1129–65 (15th ed.1982) and then it reversed the rulings of the lower courts.

> The appropriate discount [interest] rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount [interest] rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration of the quality of the security and the risk of subsequent default.

*Id.* at 651. First, the court found that § 6621 would not always reflect the prevailing market rate because of the possibility that the rate in effect on the date of confirmation could be three and one-half to nine and one-half months old. *See id.* at 652. Second, the court refused to apply § 6621 to all deferred payments in a Chapter 11 plan because doing so "ignores variations between the length of the payout period, the quality of the security, and the risk of subsequent default." *Id.*

Some courts have read *Southern States* to advocate using the coerced loan method, even though it does not specifically do so. In a footnote, the court notes that one commentator likens using § 6621 interest to pay off a tax debt to imposing a "coerced loan." *Id.* n. 7. However, the court in *Southern States* did not believe that the coerced loan method should be the exclusive measure of interest rate for cram down purposes. *Id.* Further, the passage

cited by *Southern States* is from the 1982 edition of Collier on Bankruptcy. That edition of the treatise advocated the coerced loan approach without citing any then-existing authority and did not mention the formula approach. *See In re Computer Optics, Inc.*, 126 B.R. 664, 671 (Bankr.D.N.H.1991). Since then, the treatise has been revised such that the current edition of Collier on Bankruptcy analyzes the three basic approaches to which courts currently subscribe. *See* COLLIER ON BANKRUPTCY ¶ 1129.06[1][c].

In the present case, the appropriate interest rate to be paid on a secured creditor's claim in a reorganization case is the prevailing market rate using the factors laid out in *Southern States*. HAFC, using the coerced loan theory, argues that the contract rate of interest best reflects the market rate, but the Debtor claims that the formula method is more appropriate. Of course, the contract rate and the relationship between the parties is relevant to risk analysis, but as evident by the divergent caselaw, it is not the exclusive measure on the cram down interest rate. *See In re Oaks Partners, Ltd.*, 135 B.R. 440, 444 (Bankr.N.D.Ga.1991). Bankruptcy courts within the Eleventh Circuit agree that *Southern States* is controlling law, yet they disagree on the proper method to determine interest rates. *See, e.g., In re Felipe*, 229 B.R. 489, 495 (Bankr.S.D.Fla. 1998) (construing *Southern States* as endorsing a coerced loan method); *In re Corley*, 83 B.R. 848, 853 (Bankr.S.D.Ga. 1988) (applying the lesser of the contract rate or market rate for lenders to individuals similar to the debtor); *Oaks Partners*,

---

The Secretary shall establish an adjusted rate of interest ... not later than October 15 of any year if the adjusted prime rate charged by banks during September of that year, rounded to the nearest full percent, is at least a full percentage point more or less than the interest rate which is then in effect. Any such adjusted rate of interest shall be equal to the prime rate charged by banks, rounded to the nearest full percent, and shall become effective on February 1 of the immediately succeeding year. An adjustment provided for

under this subsection may not be made prior to the expiration of 23 months following the date of any preceding adjustment under this subsection which changes the rate of interest. *Southern States*, 709 F.2d at 649 n. 1 (citing 26 U.S.C. § 6621(b)). This tax code section has been amended several times since the *Southern States* decision, and now provides for the quarterly determination of interest rates. See 26 U.S.C. § 6621(b)(1) (Law.Co-op.1998).

135 B.R. at 446) (applying the formula method); *In re SM 104 Ltd.,* 160 B.R. 202, 232 (Bankr.S.D.Fla.1993) (applying the formula method); *In re General Dev. Corp.,* 147 B.R. 610, 618 (Bankr.S.D.Fla.1992) (setting a fixed market rate of interest for various types of tax claims). Since bankruptcy courts in this circuit have yet to agree on a particular method for determining the market rate, and because the circuit court has yet to specify the appropriate approach, a review of the coerced loan and formula methods is instructive.

### 1. *Coerced Loan Method*

COLLIER ON BANKRUPTCY succinctly describes the coerced loan method:

> Some courts ... treat any deferred payment of an obligation under a plan as a deferred loan and the rate of return with respect to such loan must correspond to the rate which would be charged or obtained by the creditor making a loan to a third party with similar terms, duration, collateral, and risk. These courts then review evidence as to what rate the market would charge to make the loan proposed in the plan.

COLLIER ON BANKRUPTCY ¶ 1129.06[1][c][ii]. Some courts, like the Third Circuit Court of Appeals in *General Motors,* go a step further and presume that the creditor's contract rate is the appropriate market rate. *General Motors,* 999 F.2d at 68. This court based its decision on the costs of making a new loan and the underlying goal of judicial economy, but most importantly held that the creditor's profit expectation should be included in the cram down interest rate. *See id.,* at 69. The court presumed that a Chapter 13 extends the lending relationship between the debtor and creditor. *See id.* Since the original lending relationship naturally includes a mutual anticipation of profit (creditors value the money more than the collateral while debtors value the collateral more than money), the court concluded that courts cannot deny the creditor's profit expectation and simultaneously preserve the debtor's profit expectation without al-

tering the lending relationship in conflict with the bankruptcy code. *Id.; accord Smithwick,* 121 F.3d at 214. Some courts eliminate the possibility of the creditor obtaining too great a profit by capping the cram down interest rate at the contract amount. *See United Carolina Bank,* 993 F.2d at 1131; *In re Corley,* 83 B.R. at 853 (looking to prevent "additional profit" to the lender as a result of the bankruptcy).

### 2. *Formula Method*

The formula method, as explained by Collier,

> takes a riskless cost of money, reflected by the interest rate paid for treasury notes, to which is added a premium based on the "term, quality of security, and risk of repayment or financial condition of the borrower," ... and the physical, financial and personal factors relating to the quality of the security and the risk of future default.... Included therein is also a measure of profit which is provided to the creditor who is forced by the Debtor's plan to maintain what is essentially a borrower/lender relationship. This necessarily involves an interwoven examination of the strength and credibility of the plan proponent's feasibility demonstration. In this way, courts can assess the riskiness of the loan in relation both to the market for similar loans and the debtor's particular risk profile.

COLLIER ON BANKRUPTCY ¶ 1129.06[1][c][iii] (citations omitted). This method accounts for the factors laid out in *Southern States* and was endorsed by the Second Circuit in *In re Valenti. See Valenti,* 105 F.3d at 64. The *Valenti* court found the formula method preferable to other methods because "it is easy to apply, it is objective, ... it will lead to uniform results ... [and] the treasury rate is responsive to market conditions." *Id.; see also In re Camino Real Landscape,* 818 F.2d at 1506 ("[r]ates of interest in treasury obligations reflect the proper return on a riskless loan after adjustment for inflation."); *cf. Southern*

*States,* 702 F.2d at 652 (rejecting the interest rate used in the federal tax code because it may lag behind market conditions).

As pointed out by the court in *Oaks Partners,* an interest rate is composed of three elements: inflationary expectation, "real" interest, and risk. *Oaks Partners,* 135 B.R. at 445. The rate of interest on conservative investments such as treasury bills will include inflationary expectations and a "real" interest rate. *Id.* Thus, in theory, using the rate of interest on a treasury bill is a reasonable starting point when determining the market rate. *See id.* To account for the third element, risk, courts have added a risk premium of one to three percent based on the debtor's circumstances such as the debtor's credit history and viability of the reorganization plan. *See Valenti,* 105 F.3d at 64. The court-adjusted risk premium may at first appear to be arbitrary, but bankruptcy courts, familiar with the interest rates charged in their jurisdictions, are qualified to set the risk premium. *See Camino,* 818 F.2d at 1508; *but see Hardzog,* 901 F.2d at 860 (finding that judges lack financial expertise and thus courts are not well equipped to determine interest rates).

Based on the analysis of caselaw, the formula method is the better approach because it uses an objective interest rate with risk points added for risks associated with a particular case. Thus, creditors are not overcompensated, the debtor is not overburdened, the rate is easy to determine, and the factors laid out by the Eleventh Circuit in *Southern States* are considered. *See Southern States,* 709 F.2d at 652 (accounting for length of the payout period, quality of the security, risk of subsequent default). In contrast, the coerced loan method is flawed because there is no market for the type of "loan" made in a reorganization. The typical lender would not make a loan where the debt is equal to the value of the collateral without charging interest rates high enough to render the

debtor's plan unfeasible. *See Oaks Partners,* 135 B.R. at 445.

The coerced loan method has also been criticized for its inclusion of profit as part of the market rate of interest. *See* Matthew H. Harris, *Chapter 13 Cram Down Interest Rates: Another Day, Another Dollar—A Cry For Help In Ending The Quest For The Appropriate Interest Rate,* 67 MISS. L.J. 567, 574 (1997). As stated in *Valenti,* "The Bankruptcy Code protects the creditor's interest in the property, not [its] interest in the profit it had hoped to make on the loan." *Valenti,* 105 F.3d at 64 (citing *In re Hudock,* 124 B.R. 532, 534 (Bankr.N.D.Ill.1991). If the Code protected the creditor's interest in the loan, the creditor would receive more than the present value of its allowed claim. *See id.*

This is an important distinction made by the *Valenti* court because the interest rate on a loan in part reflects the creditor's monitoring costs and the risk of default by the debtor. The court in *General Motors* acknowledged that these elements are diminished in the context of a reorganization because the trustee monitors the debtor's estate and the debtor has added incentive to not default. *See General Motors,* 999 F.2d at 69 n. 8 (citations omitted). Since these two elements are lessened in a reorganization, the interest rate on a creditor's loan predominantly represents profit. The coerced loan method thus overcompensates the creditor at the expense of the debtor's estate.

Further, the coerced loan method bases the interest rate on the creditor's situation and is thus too subjective. This is because the value of a creditor's loan is based in part on risk of default by that debtor *and also* other borrowers. Calculating the interest rate in the form of a coerced loan from the creditor's point of view thus subjects the debtor to an interest rate which reflects risks of the marketplace that are caused by outside factors. For example, the market rates of interest on loans from title loan companies often exceed two hundred percent per annum. Title loan com-

panies are able to charge such high interest because their clients are bad credit risks in immediate need of cash. On the other hand, the market rate of interest in a loan from a typical credit union could be anywhere from five to ten percent. It is thus possible for one debtor to be subject to two completely different interest rates, both of which cannot reflect the length of the payment period, the type of collateral, or the risk of non-payment. The debtor's characteristics, such as the quality of the security and the risk of default, must determine the proper interest rate under § 1325(a)(5)(B)(ii). *See Matter of Lambert*, 194 F.3d 679, 684 (5th Cir.1999). Using the debtor's characteristics instead of the creditor's prevents lenders with credit-risky clients from recovering exorbitant profits in a cram down.

Even though the court in *General Motors* believed that the coerced loan method would reduce litigation expenses, I find that the method hinders, not fosters, economy because it necessitates holding evidentiary hearings regarding what the market would charge to make the proposed loan. Since the claims at issue in a Chapter 13 are worth far less than the typical Chapter 11, this would not be an efficient use of judicial resources. *See In re Ehrhardt*, 240 B.R. 1. 10 (Bankr.W.D.Mo. 1999). The formula method, on the other hand, does not necessitate evidentiary hearings on matters not related to the debtor. Thus, when compared with the coerced loan method, it is clear that the formula method is more economical and helps to relieve the court of burdensome Chapter 13 litigation.

 In the present case, the interest rate on five-year treasury bills (equal to the term of the Debtor's plan) at the time of the hearing was 6.126%. This is an effective, objective, risk-free rate with which to start, and risk points can be added to reflect the term of the payment period, the quality of security, and the risk of default to comply with *Southern States.*[4] The Debtor's Plan adds several risk points and proposes to pay HAFC at 10%. The court in *Valenti* found that most bankruptcy courts set a risk premium from one to three percent, based upon the debtor's circumstances. *Valenti*, 105 F.3d at 64. In the present case, three risk points may be too low to protect HAFC's interests because its security is a used vehicle. The value of a vehicle declines at a faster rate than other types of collateral (such as real estate), and setting the risk premium at one to three percent leaves no leeway for setting risk premiums for collateral with less risk. In order to protect HAFC's interests, the risk premium for used vehicles should be three to five percent. Because the Debtor's proposed interest rate is three to five risk points above the treasury rate, HAFC is receiving the present value of its claim through the plan payments. Therefore, the Debtor's plan satisfies the requirements of § 1325(a)(5)(B)(ii).

### *Conclusion*

Chapter 13 debtors must provide secured creditors with the present value equivalent of their claims in a Chapter 13 plan. Creditors who are forced to accept deferred cash payments over time will be compensated for the time value of money by obtaining annual interest at the market rate. I conclude that the most appropriate method for determination of the market rate is the formula method. The formula shall be calculated by using the United States treasury bill rate for a term equivalent to the Chapter 13 payout period and then adding a risk premium to reflect the

---

4. The *Seventh Circuit* in *Koopmans* applied the prime rate as the base rate. The prime rate is the benchmark used by federal reserve banks; borrowers with bad credit pay above this rate. *Koopmans*, 102 F.3d at 875. However, since risk points are already included in the prime rate to make it higher than the treasury rate, it is irrelevant which rate is the better starting point. Fewer risk points would be added to the prime rate than to the treasury rate, but both would end up being the same. *See id.*

quality of the security and the risk of subsequent default.

The Debtor's Second Modified Chapter 13 Plan which proposes to pay HAFC at 10% interest per annum complies with the requirements of § 1325(a)(5)(B)(ii) and is confirmable. HAFC's objection to confirmation is denied, and the Debtor's Second Modified Chapter 13 Plan shall be confirmed in a separate order of confirmation.