**EVABANK, Appellant,**

v.

**Sunny M. BAXTER, Appellee.**

**Civ.A. No. 02–AR–0083–NE.**

United States District Court,
N.D. Alabama,
Northeastern Division.

May 30, 2002.

John R. Lavette, Morris & Lavette PC, Birmingham, AL, for appellant.

John C. Larsen, Bond, Botes, Sykstus & Larsen, Huntsville, AL, for appellee.

## MEMORANDUM OPINION AND ORDER ON APPEAL BY EVABANK FROM THE BANKRUPTCY COURT

ACKER, District Judge.

## I. INTRODUCTION

EvaBank here appeals the decision of the Bankruptcy Court regarding valuation of its secured claim for purposes of payment under Sunny M. Baxter's ["Debtor"] confirmed chapter 13 plan. Despite arising from a bankruptcy case, the appeal essentially turns on fundamental principles of evidence, the burden of proof and the burden of going forward, joined by the question of the preclusive effect of an order, that of a chapter 13 plan confirmation order on a debtor who fails to object to a timely, pre-confirmation filed proof of claim. Although the context from which the issues raised on appeal is the realm of bankruptcy law, the applicable evidentiary and preclusion principles are no different in application here than in another area of law. Understanding this from the start may help the reader when this Court concludes that the Bankruptcy Court committed error.

## I. FACTS

The pertinent procedural and actual facts of this case are straight forward and undisputed. On December 30, 1998, Debtor borrowed $9,725.00 from EvaBank to finance the purchase of a 1996 Dodge Stratus automobile [the "Dodge"]. *See* Note, Security Agreement and Disclosure Statement ["Note"], dated December 30, 1998. (Record at Tab 6). The Note called for fifty-four monthly payments of $239.60 and included interest at 12.9% percent. *Id.* EvaBank obtained a lien on the Dodge and perfected its security interest as the first lien holder on December 30, 1998. *See* Dodge Certificate of Title. (R. at Tab 6).

Thereafter, on May 24, 2001, Debtor filed for protection under chapter 13 of the Bankruptcy Code, 11 U.S.C. §§ 1301 *et seq. See* Debtor's Voluntary Petition [the "Petition"] filed May 24, 2001. (R. at Tab 2). According to Schedule D of the Petition, at the time of filing EvaBank's claim stood at $7,188.00. In addition, Debtor valued the Dodge in the Petition and chapter 13 plan at $5,170.00, leaving the $2,018.00 balance of her EvaBank indebtedness as purportedly unsecured. *See* Petition at Schedule D. Debtor's chapter 13 plan also called for interest to be paid on all secured claims at the rate of 9% per

annum. *See* Chapter 13 Plan Summary, dated May 22, 2001. (R. at Tab 5).

Despite the fact that the Bankruptcy Court confirmed the case before the non-governmental claims bar date ["Early Confirmation"], EvaBank had its proof of claim filed before the Early Confirmation. In contrast to the Petition and chapter 13 plan, EvaBank's proof of claim listed the total amount outstanding on the Note, as of the filing date, as $6,326.34. Further, EvaBank set forth its valuation of the Dodge at $6,326.34, equal to the amount owed. *See* Proof of Claim, filed July 5, 2001. (R. at Tab 6). The interest rate indicated on EvaBank's proof of claim was the contract rate of 12.9%. *Id.*

On July 11, 2001, the plan was confirmed. It included EvaBank's claim as filed. Paragraph five of the Confirmation Order provides that "the following shall be paid when a proof of claim is properly filed: *See* attached Exhibit 'A' ". Exhibit A of the Confirmation Order delineates that EvaBank retains its lien on the Dodge under 11 U.S.C. § 1325(a)(5)(B)(i) and that its claim is classified as secured in the amount of $6,326.34, with the collateral valued at $6,326.34, and interest to be paid on the claim at 12.9%. *See* Ex. A, attached to Confirmation Order entered July 11, 2001. (R. at Tab 7). No objection to EvaBank's claim was asserted by Debtor prior to confirmation. Likewise, there has been no contention that EvaBank's claim was not properly filed, or that it was not executed by EvaBank or did not contain the required information and supporting documentation.

Despite the fact that the Confirmation Order in paragraph five expressly provides that EvaBank's claim is to be paid as fully secured with interest at 12.9%, there is another portion of the order which appears to be inconsistent with the payments delineated in paragraph five. It is the paragraph captioned "Claims May be Modified", and it contains this language:

> The Trustee will file a Motion to Allow Claims after the Bar Date, and a copy of the Motion will be mailed to all creditors. All claims will be handled in accordance with the claims classifications, amounts allowed and interest rates, if any, set forth in the Trustee's Motion to Allow Claims unless the Debtor or affected creditors file a timely objection thereto.

> The Motion to Allow Claims, as finally adjudicated, and not the proofs of claims, shall govern the handling of claims to be paid through the plan. Creditors be advised that your claim may be paid outside the plan, or paid by a third party, or your collateral may be surrendered, as set forth in the Special Provisions of this Order.[1]

---

1. This provision is not addressed by the parties to this appeal. However, the concept that a trustee can by a motion to allow claims override the specific approval of a claim by the bankruptcy judge and its terms of repayment unless objected to by a creditor is contrary to the concept of confirmation of a plan and what the Bankruptcy Court held regarding EvaBank's claim. It is also the antithesis of what the status is of a claim filed before confirmation of a case. It is, too, at variance with the status of a claim filed pre-bar date and post-Early Confirmation. This is another "cookie-cutter" approach to allowance of creditors' claims which is legally impermissible for the identical reasons discussed in this opinion regarding the Bankruptcy Judge's required valuation procedure and interest rate formula: it allows the chapter 13 trustee by post-confirmation motion without evidence to (i)overcome the "deemed allowed" position of a creditor's timely filed, properly completed proof of claim, and (ii) shift the burden of going forward to the creditor. Since the improper use of this provision in the confirmation process here appealed has not been raised by the appealing parties, nothing further need be said regarding it.

Based on what occurred in this case, this provision is not designed to apply to payment of claims and interest rates as set forth by the Bankruptcy Court in its confirmation order. Rather, it is intended in an Early Confirmation case such as this one to have application to claims filed after the Early Confirmation and before the claims bar date. Thus, it is not inconsistent with paragraph five by which the Bankruptcy Court set EvaBank's allowed secured claim and interest rate as part of the confirmation.

Subsequently, on August 3, 2001, twenty-three days after entry of the Confirmation Order, Debtor filed a Motion to Determine Value with respect to the Dodge. (R. at Tab 8). According to the Valuation of Collateral Procedures issued by the Bankruptcy Judge for the Northern Division of the Northern District, all who seek valuation of collateral are required to follow an identical procedure: "where the subject collateral is an automobile, the value *must* be based on the average of the retail and wholesale of the current N.A.D.A. Guide for the geographic area in question." U.S. Bankruptcy Court for the N.D. Ala., Northern Division, Valuation of Collateral Procedure, effective Feb 1, 1997, attached to Appellant's Brief, *Eva-Bank v. Baxter*, No. 01–82345, filed Jan. 25, 2002 at p. 27 (emphasis added). In compliance with the Bankruptcy Court's mandated method of valuation, Debtor submitted the motion accompanied by the required affidavit ["Valuation Affidavit"] in the exact form promulgated by and using the method of valuation directed by the Bankruptcy Court with the exception that trade-in value was used by Debtor and allowed by the Bankruptcy Court to be used instead of the wholesale value. The value of the Dodge was, but for a five dollar mathematical error, the midpoint between the N.A.D.A. retail value [$5,950.00] and trade-in value [$4,400.00], or $5,170.00. *See* Valuation Affidavit and N.A.D.A. Automated Vehicle Valuation, attached as Ex. A to Debtor's Motion to Determine Value. (R. at Tab 8).

More specifically, the Motion to Determine Value did not say that the value was the average of N.A.D.A. retail and trade-in. It simply set forth: "Debtor avers that the value of the creditor's interest in the estate's interest in such property is $5,170.00 as evidenced by the attached affidavit." *See* Motion To Determine Value. The Valuation Affidavit only sets forth in pertinent part: "My name is *Sunny M. Baxter* and I am the owner or possessor of one: *1996 Dodge Stratus. EvaBank* purportedly has a secured claim in such property, which has a value of: *$5,170.00* [sic]". *See* Valuation Affidavit[2] Attached to the Motion and Valuation Affidavit is a N.A.D.A. official Used Car Guide Automated Vehicle Valuation sheet which sets forth the retail, trade-in, and loan values of the Dodge and that a $425.00 reduction in each was made for excess mileage. Nothing else is represented regarding the Dodge, including the condition of the essential mechanical parts, body condition, any extras that it may have and that increase its value, or what items it may lack and that arguably reduce value. Indeed, a stranger to the affidavit procedure innovated by the Bankruptcy Court could not determine how Debtor's valuation was reached. Also contained in Debtor's valuation motion is Debtor's request to reduce the interest rate on EvaBank's claim to 9% from 12.9%. *See* Motion to Determine Value. In this respect, all the Valuation Affidavit sets

---

**2.** The underlined words represent the blank spaces on the form affidavit filled in by Debt- or.

forth is: "This value is to be paid at 9% interest." *See* Valuation Affidavit.

EvaBank objected to Debtor's motion arguing that (1) the valuation procedures used by the Bankruptcy Court were improper; (2) Debtor could not replace the vehicle for less than its N.A.D.A. retail value; (3) a Motion to Determine Value was not the proper filing by which to change the already confirmed interest rate on an allowed secured claim; and (4) absent evidence by Debtor, the contract rate of interest must be paid on EvaBank's claim. *See* Response to Motion to Determine Value, filed August 10, 2001. (R. at Tab 9).

What is clear to this Court is that had EvaBank not objected, no hearing on the Motion to Determine Value would have been held by the Bankruptcy Court. This is evidenced by the Bankruptcy Court's sanctioned form motion to determine value with supporting affidavit. It sets forth: "No hearing will be conducted on this motion unless a written response is filed with the clerk of the U.S. Bankruptcy Court...If no response is timely served and filed, the motion to value security shall be deemed unopposed and the Court may enter an order granting the relief sought." *See* Valuation of Collateral Procedure. It also sets forth the date, time and place for a hearing should an objection be timely filed and served. More telling regarding the fact that EvaBank would lose the valuation fight if it did not object is that the Bankruptcy Court's Valuation of Collateral Procedure sets forth that "[i]f an objection is not filed within the 23 days set forth in the motion, then the case manager will forward the matter to the Judge for entry of judgment in conformity with the amount set forth in the motion."

Ultimately, a hearing was held on August 27, 2001, at which Debtor presented no evidence. She simply relied on the form motion and Valuation Affidavit. Faced with what it knew to be the standard practice of the Bankruptcy Court of determining collateral values based solely on the form motion and affidavit if not opposed by evidence presented by the secured creditor, EvaBank elected to put on evidence at the hearing, and it called Paul Carpenter, a loan officer in EvaBank's auto loan department, to testify regarding the value of the Dodge. Carpenter testified that the common practice among banks and retail car dealers was to value a vehicle based on its Black Book value. *See* Transcript from hearing of August 27, 2001 ["Transcript"] at p. 5. (R. at Tab 18). Based on the vehicle model, year and the assumption of high mileage, Carpenter set the value of the Dodge, according to the Black Book, at $6,300. (T. at 12).[3] He also testified that based on a drop in Debtor's credit rating from a "B" at the time the car was purchased to a "C" or possibly a "D" at the time of confirmation, her ability to actually buy the Dodge at or below Black Book value would be adversely impacted. (T. at 10). At the conclusion of the hearing, the Bankruptcy Court accepted EvaBank's valuation over the value set forth in Debtor's Valuation Affidavit. (T. at 13).

The Bankruptcy Court also addressed the interest rate on EvaBank's claim at the

---

**3.** Although the valuation is to be as of the confirmation date, *see* 11 U.S.C. § 1325(a)(5)(B)(ii); *see also, e.g. In re Southern States Motor Inns, Inc.,* 709 F.2d 647, 650–51 (11th Cir.1983); *In re Jones,* 271 B.R. 397, 400 (Bankr.S.D.Ala.2000), this valuation appears in the record before the Court to be as of the August 27, 2001, hearing on the Motion to Determine Value. It is within $23.64 of what EvaBank's claim sets forth, $6,324.64, and supports what EvaBank's valuation of the Dodge, a used car, would have been a month and a half earlier when the case was confirmed.

hearing. EvaBank offered the contract rate as the appropriate rate of interest to be applied to the claim. Since Debtor presented only the assertion in the Valuation Affidavit that the interest rate should be 9%, this made the record devoid of any evidence as to why Debtor should be allowed to pay EvaBank interest on its secured claim at 9%. Undeterred by this evidentiary void, the Bankruptcy Court indicated that EvaBank and creditors in general were not entitled to and would not receive from it the contract rate of interest: "[t]he biggest thing I am going to give you is not going to be your contract rate." (T. at 15). The Bankruptcy Court also stated:

> we are not going to consider, hey, this person has a "B" credit rating. Sure they do. They are in bankruptcy and that's part of it. This bank is in the business of sub prime lending for people that get cars, and part of your risk is a lot of these folks with sub prime credit risk going in but the law isn't designed to give you your return on the contract. Chapter 13 isn't designed to give you your return, twenty-four percent return on this contract. The law was designed and written to give you the present value of your collateral from the time it is put in the plan until the time you get paid. By no means is it your profitable return.

*Id.* It is clear from the transcript that it was the Bankruptcy Court's intention to utilize a pre-determined formula in all chapter 13 cases to determine the interest rate to be paid on secured claims. Specifically, the Court said:

> there will be a question of, if we adopt [a formula], whether we are going to show that we won't have to keep doing it on a case by case basis, whether we apply it all across the board, to all the Chapter 13s and give the trustee the right.

> Probably what I am going to do is . . . adjust it twice a year, in December and July based on the rates. What we might start doing is starting with whatever the rate is now and then give you the option to adjust it twice a year . . . .

(T. at 16).

Despite the Bankruptcy Court's lack of evidence on any alternative interest rate to that offered by EvaBank, it set 9.8% as the rate for EvaBank's secured claim. The Court based its determination on the method set forth in *In re Hollinger*, 245 B.R. 691, 694 (Bankr.M.D.Fla.2000), which used as its formula the current five year treasury bill rate plus a three to five percent "risk premium":

> The Court takes judicial notice that the five-year Treasury Bill rate was 4.83% when the debtor's plan was confirmed on July 11, 2001. Thus, using a three to five percent risk premium the present value range for EvaBank's claim is 7.83% to 9.83%. Although the Court recognizes that a three to five percent risk premium may not be appropriate in all cases involving used cars, the Court believes that it is appropriate here in light of the risks involved in this case . . . The Court believes that a five percent risk premium will ensure that EvaBank receives the present value of its claim and that it is sufficient to provide EvaBank with the present value of its claim under 11 U.S.C. § 1325(a)(5)(B)(ii) in light of the risks involved in this case. Thus, the Court approves 9.83% to be paid on EvaBank's claim.

*In the Matter of Baxter*, 269 B.R. 458, 462 (Bankr.N.D.Ala.2001), *citing In re Hollinger*, 245 B.R. at 694. Other than a discussion in the Bankruptcy Court's written decision about the *Hollinger* case's use of the three to five percent range for a risk premium to be added to the five year treasury bill rate, there is no factual basis

given for why this range is applicable, or why it chose a five percent risk premium for this case. In point of fact, should the *Hollinger* formula method be an acceptable way to set interest rates for secured claims, there were no evidentiary facts before the Bankruptcy Court regarding what an appropriate risk premium should be in this case.

On November 16, 2001, EvaBank filed a Motion to Alter or Amend, Make Additional Findings and Take Additional Testimony and Evidence, to have the Bankruptcy Court reconsider its ruling on the interest rate. (R. at Tab 16). The motion was denied, and EvaBank filed this appeal.

One other fact is relevant to this appeal. It is the fact that before the Court are three other appeals involving EvaBank, debtors, and the same valuation procedure mandated by the Bankruptcy Court, or a judge of that court, to be used by a debtor and the person objecting to the value of a secured creditor's claim. In each instance, the same procedure was used for setting the value of the collateral, splitting the difference between retail and wholesale/trade-in, and fixing the discount/interest rate factor.

### III. DISCUSSION

To appreciate the fallacies in the Bankruptcy Court's valuation procedure, one needs to understand the relevant bankruptcy law, something this Court has tried to do. 11 U.S.C. § 1325 is a starting point for chapter 13 plan confirmation purposes. In pertinent part it sets forth:

a. Except as provided in subsection (b), the court shall confirm a plan if—

. . .

(5) with respect to each allowed secured claim provided for by the plan—
(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim

11 U.S.C. § 1325(a)(5). It is § 1325(a)(5) that specifies the valuation which is to occur for confirmation of a chapter 13 plan under the terms of which a debtor retains use of collateral securing repayment of a claim. However, 11 U.S.C. § 506(a) sets forth the rule for determining the "value" used in § 1325(a)(5). It provides:

(a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest...is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property...and is an unsecured claim to the extent that the value of such creditor's interest...is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 506(a).

### A. 11 U.S.C. § 1325(a)(5)(B)'s Requirements For Confirmation of a Cramdown Chapter 13 Plan.

11 U.S.C § 1325(a)(5)(B) enables a debtor, under appropriate circumstances, to alter a secured creditor's contractual rights regarding repossession and sale of collateral. When appropriate, a debtor has the discretion to surrender the property to the secured creditor. Alternately, the debtor can maintain possession of the collateral. 11 U.S.C. § 1325(a)(5)(B) [the "Cramdown Provision"]. *See also, Associates Commercial Corp. v. Rash*, 520 U.S. 953, 964, 117 S.Ct. 1879, 138 L.Ed.2d 148

(1997)("[t]he code's cramdown option displaces a secured creditor's state-law right to obtain immediate foreclosure upon a debtor's default"). When the debtor elects to retain possession, the creditor keeps its security interest in the collateral. 11 U.S.C. § 1325(a)(5)(B)(i). In return, the debtor's chapter 13 plan must provide for payments to the creditor over the term of the plan totaling no less than the value of the allowed amount of the creditor's secured claim as of the date of confirmation. 11 U.S.C. § 1325(a)(5)(B)(ii).

Full payment of an allowed secured claim requires two determinations. One is the amount of the claim which is secured as of the date of confirmation of the plan. This is accomplished by establishing the value of the collateral securing repayment of the claim as of the date of confirmation. This is the § 506(a) valuation. The second is ascertaining what stream of future payments will be equal in value to the value of the claim as of the date of confirmation. This is the claim's present value. To achieve this end necessitates post confirmation interest be paid on the amount owing. The equivalency of the value of the stream of future payments over time to the present value of the secured claim element of the Cramdown Provision is necessary to compensate creditors for their inability to use the money owed while payments under the plan are being made. This goal and full satisfaction of the secured debt is achieved in a chapter 13 plan by finding what interest rate creates equality between the value of the secured claim as of confirmation and the value of periodic payments over some period in the future. *See, e.g., Matter of Smithwick,* 121 F.3d 211, 212 (5th Cir.1997); *General Motors Acceptance Corp. v. Jones,* 999 F.2d 63, 66 (3d Cir.1993); 2 William N. Norton, *Norton Bankruptcy Law and Practice 2d* § 122:8 (2d ed.2001), *citing Matter of Richards,* 106 B.R. 762 (Bankr.M.D.Ga.

1989) (purpose of present value requirement under cramdown provision is to compensate creditor for delay in receiving payment of allowed secured claim).

### 1. Section 506(a) Valuation.

The initial bankruptcy law consideration is how to set the value of the secured claim as of the date of confirmation of a debtor's Chapter 13 plan. In *In re Rash,* the Supreme Court held that § 506(a) of the Bankruptcy Code requires the use of a replacement value standard to determine the value of collateral in a chapter 13 plan when the debtor retains and uses the property securing a creditor's claim. Replacement value is defined as what the debtor would have to pay for comparable property, 520 U.S. at 955–56, 117 S.Ct. 1879, or "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller", *id.* at 960, 117 S.Ct. 1879, or the "cost the debtor would incur to obtain a like asset for the same 'proposed . . . use'". *Id.* at 965, 117 S.Ct. 1879.

*In re Rash* was a chapter 13 case in which the valuation of a truck was called into question. The case was a cramdown case so valuation was, as here, governed by 11 U.S.C. § 506(a). The Court noted that in cramdown cases there were three ways by which valuation could be determined: (1) foreclosure value; (2) replacement value; and (3) the midpoint between foreclosure and replacement value. In *Rash,* the Supreme Court reviewed the Seventh Circuit case of *In re Hoskins,* 102 F.3d 311 (7th Cir.1996), which employed a "split-the-difference" approach to valuation, and was not persuaded by the Seventh Circuit approach. The *Hoskins* court held that "in chapter 13 cases involving automobiles and similar assets used to produce income for the debtor the value of the secured interest is the average of the retail

and the wholesale value of the collateral." 102 F.3d at 316. The Supreme Court rejected the *Hoskins* valuation standard for § 506(a) purposes by stating that "[w]hatever the attractiveness of a standard that picks the midpoint between foreclosure and replacement values, there is no warrant for it in the Code." *In re Rash,* 520 U.S. at 964, 117 S.Ct. 1879.

■ Although one might dispute what replacement value is under *Rash,* it cannot be disputed that *Rash* stands for the proposition that it is improper to make a valuation determination based on the arbitrary formula of splitting the difference between two values—whether foreclosure versus replacement, or wholesale versus retail or trade-in versus retail—to fix the value of collateral securing a claim. What the Supreme Court in *Rash* specifies is that replacement value is ascertained based on the relevant factors in each case to find the "cost the debtor would incur to obtain a like asset for the same 'proposed...use.'" *Id.* at 965, 117 S.Ct. 1879.

Despite *Rash's* valuation standard and the fact that the Supreme Court left it up to the bankruptcy courts to decide the best way to determine replacement value based on the evidence presented, some lower courts making valuation determinations after *Rash* point to footnote 6 in the *Rash* decision as a means to justify veering from the *Rash* holding. Footnote 6 indicates that replacement value may be the equivalent of "retail value, wholesale value, or some other value...depend[ing] on the type of debtor and the nature of the property." *Id.* at 965 n. 6, 117 S.Ct. 1879. This statement is simply a reading of § 506(a) of the Bankruptcy Code, 11 U.S.C. § 506(a), which sets forth that the property should be valued in light of its purpose and proposed disposition or use. It is not a holding that retail is never the replacement value or that wholesale is never the

replacement value, or that some simple method may be derived for application in all cases without reference to the facts of each case.

Although *Rash* rejected the split-the-difference approach of valuation based on the midpoint of foreclosure and retail values, some cases decided after *Rash* continue to apply a split-the-difference approach. *See, e.g., In re Getz,* 242 B.R. 916, 919–20 (6th Cir. BAP 2000); *In re Lyles,* 226 B.R. 854, 856–57 (Bankr.W.D.Tenn.1998); *In re Glueck,* 223 B.R. 514, 519–20 (Bankr. S.D.Ohio 1998); *In re Oglesby,* 221 B.R. 515, 519 (Bankr.D.Colo.1998); *In re Younger,* 216 B.R. 649, 656–57 (Bankr. W.D.Okla.1998); *In re Franklin,* 213 B.R. 781, 783 (Bankr.N.D.Fla.1997). These courts defend their holdings as acceptable under *Rash* by saying that the average between retail and wholesale is *merely a starting point* to which adjustments are permitted based on the presentation of evidence. *Id.* The justifications for using this valuation methodology focus on the belief that a pricing guide retail value such as N.A.D.A. or Black Book is too high because the debtor may have access to markets other than the retail market, which courts interpret as meaning that debtors might purchase their cars from places other than car dealers. *See In re Getz,* 242 B.R. at 919; *In re Glueck,* 223 B.R. at 519. Additionally, some of these courts note that inherent dealer overhead costs are included in retail numbers so they must be adjusted according to footnote 6 in *Rash. See In re Glueck,* 223 B.R. at 519; *In re Oglesby,* 221 B.R. at 519; *In re Younger,* 216 B.R. at 656. At least one other court which follows the split-the-difference approach has determined that the starting point for valuation should be Blue Book retail value decreased by five percent. *See In re Renzelman,* 227 B.R. 740, 742 (Bankr.W.D.Mo.1998) (finding the

reduction necessary because chapter 13 debtors do not always purchase cars from dealers and the five percent reduction provides the average amount debtors would spend (but the court does not provide any support for this figure)). Lessening the precedential value of each of these opinions and with the exception of *Younger*, is that they only had valuation evidence consisting of the make, model and year of the vehicle plus the N.A.D.A. or similar price guide values.

As indicated, these courts use a version of the split-the-difference approach to valuation as a starting point in the valuation process—not the ending value. In this respect, each is distinguishable from what is contemplated by the form motion and Valuation Affidavit used by the Bankruptcy Court in this case: the split-the-difference calculation is the valuation unless the secured creditor objects and presents a valuation of sufficient evidentiary weight to overcome how the Bankruptcy Court obviously views the evidentiary value of its form motion and form affidavit.

There is a compounding of errors contained in opinions of some courts interpreting *Rash.* Despite the fact that *Rash* requires consideration of the facts regarding valuation in each instance, some courts are circumventing the need for the presentation of evidence by twisting the use of the term "replacement value" to justify a rule for all cases of splitting the difference between retail and wholesale/trade-in or replacement and foreclosure. Under *Rash*, the appropriate value for the car at issue in a chapter 13 case in which the debtor is retaining the car for the intended use is the hypothetical cost of obtaining a like vehicle of like condition in the open market. If evidence is presented proving the value of that car in the market for the debtor's intended use, then this value is what must be used. It may be that this is

the retail price at which a car dealer would sell the vehicle or it may be a different price. Under *Rash*, it is the evidentiary facts of each case which bears on the valuation under 11 U.S.C. § 506(a). It is not that one valuation method may be used when it does not take into account the fact variations from one case to another. Yet, this is precisely what the Bankruptcy Court's mandated valuation procedure does. It is also what these other courts overlook in using a split-the-difference approach as a "starting point". A "starting point" using a rejected valuation methodology is just as flawed as the "ending point" from an evidentiary standpoint if they use the same methodology.

█ It is this short cut approach to valuation, to value the car without any evidence other than a car pricing guide, that constitutes a major problem in this and similar cases. Absent more than this split-the-difference information, this type of valuation is not permitted under *Rash*, the Bankruptcy Code, or the rules of evidence. For purposes of this EvaBank appeal, it suffices to hold that the Bankruptcy Court cannot utilize a split-the-difference between N.A.D.A. wholesale and retail approach as *the* measure of the value of EvaBank's secured claim. In fairness to the Bankruptcy Court, it did not do so in this particular case. However, the Bankruptcy Court did cause EvaBank to go to the expense and trouble of disproving an improper standard of valuation because of what is clearly contemplated by its Motion to Determine Value procedure: if the creditor does not object and put on proof of a different value at a hearing, it will bear the risk—indeed the very high probability—that the Bankruptcy Court's short cut on valuation will be used to set a value different from that claimed by EvaBank in its proof of claim. What is wrong with the Bankruptcy

Court's cookie-cutter valuation procedure is that it improperly shifts the burden of going forward to the creditor. The same may be said regarding the use of the same procedure as a "starting point". Why this is so resides in the mixture of bankruptcy law with the law of evidence.

## 2. Burden of Proof

11 U.S.C. § 502 governs allowance of claims. It specifies that "[a] claim or interest, proof of which is filed . . . is deemed allowed, unless a party in interest . . . objects." Rule 3001(f) of the Fed. R. Bankr. P. contains a clear statement of the evidentiary effect of a properly filed and completed proof of claim: it "shall constitute prima facie evidence of the validity and amount of the claim." Until an objection to EvaBank's proof of claim was made and because Evabank as a creditor with a claim against a debtor bears the burden of proof with respect to any claim filed under § 502(a) of the Bankruptcy Code, *see, e.g., In re Brown,* 244 B.R. 603, 610 (Bankr. W.D.Va.2000); *In re Hermann,* 224 B.R. 101, 102 (Bankr.D.Minn.1998); *In re Robertson,* 135 B.R. 350, 352 (Bankr.E.D.Ark. 1992); *In re Schaumburg Hotel Owner Limited Partnership,* 97 B.R. 943, 950 (Bankr.N.D.Ill.1989); *In re Lampert,* 61 B.R. 785, 787 (Bankr.W.D.Wis.1986), EvaBank's proof of claim was deemed allowed and constituted prima facie evidence of the amount and validity of its secured claim. Because no objection to the secured claim was made, this state of affairs is all that was before the Bankruptcy Court as of the time of confirmation of Debtor's chapter 13 plan.

After the confirmation order became final, the Motion to Determine Value was filed. Although not captioned or phrased as an objection to EvaBank's secured claim, the intended effect was to contest the amount of the secured portion of EvaBank's claim. For this reason, the Motion to Determine Value is in reality a post-confirmation collateral attack on EvaBank's secured claim. *See In re Adair,* 230 F.3d 890, 895–95 (7th Cir.2000). It is also in this case the equivalent of a post-confirmation objection to EvaBank's claim.[4]

■ Overlooking for purposes of this portion of the discussion that the collateral attack via the Motion to Determine Value was made after confirmation of Debtor's cramdown chapter 13 plan, and assuming for argument purposes that Debtor could properly attack EvaBank's claim post-confirmation, Debtor was still faced with the evidentiary state of EvaBank's claim constituting prima facie evidence of the extent of its secured status. For this reason, EvaBank had met its burden of going forward and had shifted the burden to Debtor.

To overcome this state of affairs, Debtor had to do more than just object. She had to present evidence of sufficient evidentiary weight to meet her burden of going forward thereby returning the burden of going forward to EvaBank. *See In re Lundell,* 223 F.3d 1035, 1039 (9th Cir. 2000); *In re O'Connor,* 153 F.3d 258, 260 (5th Cir.1998); *In re Hemingway Transport, Inc.,* 993 F.2d 915, 925 (1st Cir.1993); *In re Multiponics,* 622 F.2d 709, 714 (5th Cir.1980). Debtor failed to do so. First, the form motion and Valuation Affidavit

---

4. The Court is aware of the position of one bankruptcy court that a motion to value brought under 11 U.S.C. § 506(a) is not within the reasons asserted to be a basis for an objection to a claim-here secured-under 11 U.S.C. § 502(a). *See In re Fareed,* 262 B.R. 761, 764–65 (Bankr.N.D.Ill.2001). This Court does not read 11 U.S.C. § 502 to be so limited. *See also* n. 8 *infra.*

following the Bankruptcy Court's stipulated method of valuation as the average of N.A.D.A. retail and wholesale was of no evidentiary moment. This is because use of a method of valuation that is predicated on a rejected methodology is simply not "evidence" of value. The Valuation Affidavit promulgated by the Bankruptcy Court is fatally defective for other reasons. Among other things, it does not contain any basis on which one could ascertain the foundation of Debtor's knowledge regarding the value of the Dodge. Debtor's affidavit is without any facts to demonstrate her basis for valuation. As such, it "is a mere conclusion and that is insufficient." *Bruce Construction Corp., et al. v. U.S.*, 242 F.2d 873, 877 (5th Cir.1957). *See also, Leigh v. Warner Brothers, Inc.*, 212 F.3d 1210, 1217 (11th Cir.2000); *BancOklahoma Mortgage Corp. v. Capital Title Co., Inc.*, 194 F.3d 1089, 1101 (10th Cir.1999); *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999); *West–Fair Electric Contractors v. Aetna Casualty & Surety Co.*, 78 F.3d 61, 63 (2d Cir.1996); *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir.1985); *Benton–Volvo–Metairie, Inc. v. Volvo Southwest, Inc.*, 479 F.2d 135, 139 (5th Cir.1973). A live property owner who expresses under oath an opinion of fair market value can be cross-examined and her opinion tested. A pro forma affidavit cannot be cross-examined. Trial by affidavit does not comport with "due process". The "due process" implication of a court's total reliance on such an affidavit cannot be overlooked. In reality, Debtor's Valuation Affidavit filed in support of her Motion to Determine Value is an evidentiary nullity.

The upshot of all this is that even after Debtor objected to EvaBank's secured claim by use of the Motion to Determine Value, what the Bankruptcy Court had in front of it was EvaBank's deemed allowed claim constituting prima facie evidence of its secured status, versus an objection supported by no evidence. Given this state of evidentiary affairs, EvaBank was entitled to prevail on valuation without having to put on any additional evidence. But for the Bankruptcy Court's modus operandi that sanctions a flawed procedure by which EvaBank faced the dilemma of not objecting and having the Dodge valued at the midpoint of N.A.D.A. retail and wholesale based on the Bankruptcy Court's routine procedure for valuation, EvaBank need not have done anything to overcome the non-existent evidence supplied by Debtor. In this case, EvaBank had met its burden of proof of the value of its secured claim by the prima facie and unrebutted status of its proof of claim. *See In re Lundell*, 223 F.3d at 1039; *In re O'Connor*, 153 F.3d at 260; *In re Hemingway Transport, Inc.*, 993 F.2d at 925.

### B. The Code Requires Payment of a "Market Rate" of Interest.

Of equal importance to the proper 11 U.S.C. § 506(a) valuation of EvaBank's secured claim for cramdown of Debtor's chapter 13 plan is determining the appropriate interest factor to create equality, as of the date of confirmation, of the stream of payments proposed to be made over time by Debtor vis-à-vis the § 506(a) determined value of EvaBank's secured claim of $6,326.34. It is well settled that the Bankruptcy Code requires payment of a "market rate" of interest to secured creditors. *See, e.g., In the Matter of Lambert*, 194 F.3d 679, 680 (5th Cir. 1999). In other words, the appropriate discount rate must be determined on the basis of the rate of interest that is reasonable in light of the risks involved. In determining this discount rate, courts are to consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration of the quality of the security and the risk of subsequent

default. *Id.* at 680 ("[t]wo decisions by our sister circuit colleagues...*In re Camino Real Landscape Maintenance Contractors, Inc.* [9th Cir.] and *Southern States Motor Inns, Inc.* [11th Cir.] provide further support for the proposition that the market rate is the proper rate of interest"); *In re Fowler,* 903 F.2d 694, 697 (9th Cir.1990). *See also,* 5 *Norton Bankruptcy Law and Practice 2d* § 122:8 (2d ed.1997)("most consistent with the general theory of present value presented in Code § 1325(a)(5)(B)(ii)...[is] the 'current market rate' for similar loans").

Unfortunately, the Code does not specify how to accurately calculate the market interest rate.[5] Further convoluting the issue, the Circuits have demonstrated a remarkable inability to agree upon the proper way to set the market rate of interest under § 1325(a)(5)(B)(ii) and similar sections in Chapters 11 and 12.[6] Two divergent theories have emerged: the Coerced Loan Theory and the Formula Method.

### 1. Coerced Loan Theory

The majority, including the Third, Fourth, Fifth, Sixth, Seventh, Tenth and Eleventh Circuits have adopted the "coerced loan" approach. The basic premise of the theory is that "in effect [§ 1325] requires the creditor to make a new loan in the amount of the value of the collateral rather than repossess it, and the creditor is entitled to interest on his loan." *Memphis Bank & Trust Co. v. Whitman,* 692 F.2d 427, 429 (6th Cir.1982). Only by compensating a secured creditor at an interest rate it would normally accept from a similarly situated third party with credit similar to the debtor's will a creditor be placed in the same position that it would have been in but for the cramdown. Therefore, the appropriate rate of interest is "that which the secured creditor would charge, at the effective date of the plan, for a loan similar in character, amount and duration to the credit which the creditor will be required to extend under the plan." *General Motors Acceptance Corp. v. Jones,* 999 F.2d at 68. *Accord, In the Matter of Smithwick,* 121 F.3d at 214 ("we are persuaded by the Third Circuit approach...which best calculates the present value of the payments offered under the plan"); *Koopmans v. Farm Credit Services of Mid–America,* 102 F.3d 874, 875 (7th Cir.1996)("the creditor is entitled to the rate of interest it could have obtained had it foreclosed and reinvested the proceeds in loans of equivalent duration and risk"); *United Carolina Bank v. Hall,* 993 F.2d 1126, 1130–31 (4th Cir.1993)("business opportunity that the secured creditor might otherwise have been able to pursue best determines the present value of the allowed secured claim"); *In re Hardzog,* 901 F.2d 858, 860 (10th Cir.1990) (Chapter 12 case: bankruptcy courts should use the current market rate of interest for similar loans in the region).

---

5. Regardless of which formula is appropriate, the Eleventh Circuit has unequivocally held that a single interest rate cannot be appropriate in all situations. *In the Matter of Southern States Motor Inns, Inc.,* 709 F.2d 647, 652 n. 6 (11th Cir.1983).

6. Cramdown provisions containing similar language appear in Chapters 11, 12, and 13 of the Bankruptcy Code. *See Southern States,* 709 F.2d at 652 n. 6 (11th Cir.1983) ("the phrase 'value, as of the effective date of the plan' in § 1129(b)(2)(A) appears in several other subsections, including § 1325(a)(5)(B)(ii)"). *See also Matter of Smithwick,* 121 F.3d at 213 ("[a]lthough this court has not addressed this question in a Chapter 13 case, it has opined on the choice of cramdown interest rate in the analogous provision in Chapter 11"); *U.S. v. Arnold,* 878 F.2d 925, 927 (6th Cir.1989)(debtors proceeded under 11 U.S.C. § 1225(a)(5)(B)(i) & (ii), "[t]his subsection is identical to that found in Chapter 13").

### a. The Contract Rate is Evidence of Current Market Rates.

In those jurisdictions where the coerced loan approach has been adopted, the contract rate of interest becomes an important benchmark from which to determine the proper interest rate. In many cases, especially when a debtor offers insufficient evidence of an appropriate alternate rate, the contract rate of interest *is* the rate the creditor would offer for a loan of similar character and duration to a customer like the debtor. Therefore, the contract rate of interest will often be given significant weight when applying the coerced loan approach. *See, e.g., In re Smith,* 42 B.R. 198 (Bankr.N.D.Ga.1984)(debtor failed to rebut presumption that contract rate is correct rate to be applied for purposes of § 1325(a)(5)(B)(ii)); *In re Vincente,* 257 B.R. 168 (Bankr.E.D.Pa.2001)(interest rate in parties' agreement is presumptively the appropriate rate to be used); *In re Vincent,* 252 B.R. 91 (Bankr.E.D.Va.2000)(contract rate of interest is presumptively the proper rate to be paid, and it is debtor's burden to rebut this presumption); *In re Smith,* 192 B.R. 563 (Bankr.W.D.Okla. 1996) (contract rate is appropriate starting point in determination of interest rate under § 1325(a)(5)(B)(ii)); *In re Kennedy,* 177 B.R. 967, 974–75 (Bankr.S.D.Ala.1995). *Contra. In re Scott,* 248 B.R. 786 (Bankr. N.D.Ill.2000) (cramdown rate of interest generally cannot be set at contract rate of interest without overcompensating credi-

tor); *In re Coles,* 252 B.R. 66 (Bankr. E.D.Va.1999)(9% interest rate proposed by the debtor was a fair rate of interest, where creditor failed to establish its incremental borrowing rate, and rate of 24% charged debtors in the contract was inappropriate).

### 2. Formula Method

The Second, Eighth and Ninth Circuits have adopted the "formula approach", according to which the interest rate is determined by ascertaining the current rate for a "risk-free" investment, usually a treasury security, for a period comparable to that of the proposed plan period, then adding an adjustment for applicable risks. *See In re Valenti,* 105 F.3d 55 (2nd Cir. 1997); *In re Fowler,* 903 F.2d at 695 (9th Cir.1990); *United States v. Doud,* 869 F.2d 1144, 1146 (8th Cir.1989) (appropriate rate consists of risk-free rate plus additional reasonable interest to compensate creditor for risk of default). *See also, In re Hollinger,* 245 B.R. at 695.[7] Proponents of the formula method point to (1) its ease of application; (2) the formula's objectivity; (3) the responsiveness of the treasury rate to market conditions; and (4) the likelihood of uniform results, *see In re Hollinger,* 245 B.R. at 695, while criticizing the coerced loan approach because of its inclusion of profit as part of the market rate of interest. *See Household Automotive Finance v. Gorham,* No. 01–2158, slip op. at 1, 22 Fed.Appx. 691 (8th Cir.2001). *But see, In re Smithwick,* 121 F.3d at 214,

---

**7.** Only the Second Circuit has explicitly rejected the coerced loan and other approaches while adopting the formula method. *In re Valenti,* 105 F.3d at 63–64 ("[w]e believe that courts adopting the '[coerced] loan' approach misapprehend the 'present value' function of the interest rate...[t]he purpose is not to put the creditor in the same position that it would have been in had it arranged a 'new' loan"). However, *Valenti* was criticized in *Rash,* 520 U.S. at 964 n. 5, 117 S.Ct. 1879, for its ruleless approach. *Compare In re Ehrhardt,*

240 B.R. 1, 5 (Bankr.W.D.Mo.1999)("the Eighth Circuit has not specifically mandated a formula for determining the market interest rate"); David G. Epstein, *Don't Go and Do Something Rash About Cram Down Interest Rates,* 49 Ala.L.Rev. 435, 456 n. 83 (1998)("the Eighth and Ninth Circuits approve a bankruptcy court's use of a formula approach, though neither requires a bankruptcy court to use the formula approach in all cases").

*citing General Motors Acceptance Corp.,* 999 F.2d at 69 ("to exclude profit would violate the statutory requirement that the creditor be placed in the same position it would have been in if it had been allowed to end the lending relationship"). *Compare American General Finance, Inc. v. Kleinknecht,* 230 B.R. 207 (M.D.Ga. 1999)(The judge, a proponent of the formula method, believed that a creditor was entitled to some margin of profit on its allowed secured claim. He noted that in fact the formula method *does* include profit because the prime rate is the rate commercial lenders charge large institutional investors, and included in the prime rate is the profit the lender hopes to make for issuing the loan).

### 3. The Eleventh Circuit: *In the Matter of Southern States Motor Inns, Inc.*

The Eleventh Circuit addressed the cramdown interest rate in *In the Matter of Southern States Motor Inns, Inc.,* 709 F.2d 647 (11th Cir.1983). *Southern States* involved a chapter 11 debtor with outstanding tax liabilities. Initially, Southern States' plan proposed to pay the tax claim over five years with an annual percentage rate of 6%. The IRS objected, and the bankruptcy court conducted a hearing to determine the proper interest rate to be applied to the government's claim. At the hearing, the debtor presented evidence that the interest rate on mortgages recently obtained by them in the area was between 9% and 10%. *Id.* The government responded with an expert who testified that the going interest rate for safe investments (treasury obligations) was 14%, and that rates for more risky loans, such as those to the debtor, were much higher. At the conclusion of the hearing, the bankruptcy court applied the interest rate established by I.R.C. § 6621 for interest on unpaid federal tax liabilities generally, and the parties settled on 12%. *Id.* at 649 n. 1

(26 U.S.C. § 6621 sets the interest rate on tax liabilities at the prime rate plus several percentage points and calls for an adjustment of the interest rate charged on tax liabilities to remain consistent with the current prime rate. However, no change may be made until at least 23 months after the last change).

The district court affirmed the bankruptcy court's decision, and an appeal was taken to the U.S. Court of Appeals for the Eleventh Circuit. The Eleventh Circuit's opinion points out that the § 6621 interest rate could lag up to two years behind current market rates, and therefore it may not reflect the market rate of interest required by § 1325(a)(5)(B)(ii) of the Bankruptcy Code. *Id.* at 652. Because of this, the Eleventh Circuit adopted the factors discussed in *Collier on Bankruptcy* as those relevant to determining an appropriate interest rate for use as a discount rate:

> The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration of the quality of the security and the risk of subsequent default.

*Id.* at 651, *quoting* 5 *Collier on Bankruptcy* ¶ 1129.03, at 1129–65 (15th ed.1982). Further, the court went on to say "deferred payment of a claim under § 1129 is a coerced loan and the rate of return with respect to such loan must correspond to the rate which would be charged or obtained by the creditor making a loan to a third party with similar terms, duration, collateral, and risk". *Id.* at 653 n. 7.

Although the Eleventh Circuit adopted the coerced loan approach in a chapter 11 case where the statutory confirmation re-

quirement regarding present valuation of a claim is in all meaningful ways indistinguishable from what must occur in a chapter 13 confirmation involving secured debts, lower courts in the Eleventh Circuit applying the formula method after *Southern States* argue that *Southern States* did not stand for the proposition that the coerced loan method should be the exclusive measure of cramdown interest rates. *See In re Hollinger*, 245 B.R. at 695. These lower courts point to the Eleventh Circuit's refusal to accept the § 6621 interest rate as evidence that the coerced loan approach cannot be the only acceptable method. *In re Hollinger*, 245 B.R. at 695.

In support of this theory, *Hollinger* points to the statement by the *Southern States* court in a footnote that:

[a] taxpayer can obtain an involuntary 'loan' from the government by failing to pay his taxes, and the government then is entitled to interest on the delinquent liabilities at the rate set by § 6621. Thus, the § 6621 rate may be *relevant* because it is the rate at which the government would make a 'loan' to a third party. *We do not believe, however, that the § 6621 rate should be the exclusive measure* of the rate which will give the government the value of its claim as of the effective date of the plan.

*In re Hollinger*, 245 B.R. at 694, *citing Southern States*, 709 F.2d at 652 n. 7 (emphasis added). The *Hollinger* court argued that under a pure coerced loan theory, the § 6621 interest rate would have to constitute the "market" rate on overdue tax debts. *In re Hollinger*, 245 B.R. at 694. Yet, this was expressly what the Eleventh Circuit rejected in *Southern States* because the rate under § 6621 was fixed for up to two years meaning that it may not reflect the market rate.

The *Hollinger* court also argues as part of its rejection of the coerced loan ap-

proach that it "is flawed because there is no market for the type of loan made in a reorganization. The typical lender would not make a loan where the debt is equal in value to the collateral without charging interest rates high enough to render the debtor's plan unfeasible." *In re Hollinger*, 245 B.R. at 696, *citing In re Oaks Partners, Ltd.*, 135 B.R. 440, 445 (Bankr. N.D.Ga.1991). This quotation from *Hollinger* demonstrates that the court overlooked the following explicit language from *Southern States:*

In addition, we believe the district court erred when it deducted 1% from the interest rate to be applied to the deferred payments for the "rehabilitation aspects" of the reorganization plan. As noted in *In re Benford, supra*, a chapter 13 case construing language identical to that found in § 1129(a)(9)(C) "[t]he statute reads 'value, as of the effective date of the plan'; *it does not read 'value, as of the effective date of the plan, but subject to reduction depending on the debtor's ability to pay'*." 14 B.R. at 161. We believe Congress intended that creditors required to accept deferred payments pursuant to § 1129(a)(9)(C) should be placed in as good a position as they would have been had the present value of their claims been paid immediately. Consequently, we hold that the *interest rate to be used in computing present value of a claim pursuant to § 1129(a)(9)(C) should be the current market rate without any reduction for the "rehabilitation aspects" of the plan.*

709 F.2d at 252(emphasis added). Thus, *Hollinger* uses justifications against the coerced loan approach that were rejected in *Southern States*.

Indeed, the Eleventh Circuit in *Southern States* Expressly found that "the evidence presented by appellants established that the prevailing market rate for compa-

rable unsecured loans at the time the plan became effective was greater than 14%." *In re Southern States*, 709 F.2d at 653. Nothing could be clearer than the Eleventh Circuit's adoption of the proper market rate of interest as the discount factor ascertained by reference to a creditor's making a loan to a third party with similar terms, duration, collateral, or absence thereof for unsecured priority tax claims and risk. In contrast, other courts have argued that the debtor must still pay the rate of interest required to borrow a similar amount on the commercial market. *In re Lambert*, 194 F.3d at 684, *citing In re Camino Real*, 818 F.2d at 1505–06 ("[t]he legislative history, however, clearly reflects that the rate of interest on deferred taxes should be the rate of interest that the debtor would pay to borrow a similar amount on the commercial market").

In the aftermath of *Southern States*, bankruptcy courts in the Eleventh Circuit continue to disagree on the proper method to determine interest rates. *See, e.g., In re Hollinger*, 245 B.R. at 695 (formula method); *In re Felipe*, 229 B.R. 489, 495 (Bankr.S.D.Fla.1998)(construing *Southern States* as endorsing a coerced loan method); *In re SM 104 Ltd.*, 160 B.R. 202 (Bankr.S.D.Fla.1993) (applying the formula method); *In re General Dev. Corp.*, 147 B.R. 610 (Bankr.S.D.Fla.1992) (setting a fixed market rate of interest for various types of tax claims); *In re Corley*, 83 B.R. 848, 853 (Bankr.S.D.Ga.1988) (applying the lesser of the contract rate or market rate for lenders to individuals similar to the debtor).

### 4. Evidentiary Vacuum

Although the lower courts in the Eleventh Circuit are at odds with respect to which approach should be used to set the interest factor for present valuation determinations under 11 U.S.C. § 1325(a)(5)(B)'s cramdown provisions,

this Court need not in this case decide that one method of ascertaining the prevailing market rate of interest required under *Southern States* is *the* method. What happened in this case fails to achieve what *Southern States* mandates, whatever that mandate. This is due to several factors. Initially, there are no facts in the record before this Court on which the Bankruptcy Court could have ascertained whether the *Hollinger* court formula of the five year treasury bill rate plus a three to five percent risk premium was appropriate for Debtor's chapter 13 plan. Other than the assertion in the Bankruptcy Court's opinion that "[t]he Court believes that a five percent risk premium will ensure that EvaBank receives the present value of its claim and that it is sufficient to provide EvaBank with the present value of its claim under 11 U.S.C. § 1325(a)(5)(B)(ii) in light of the risks involved in this case", *In the Matter of Baxter*, 269 B.R. at 462, there is no basis in the record to support this or any risk premium. Debtor's affidavit certainly does not. It contains no facts or other basis for the rate set.

Also, the *Hollinger* formula adopted by the Bankruptcy Court does not establish the *Southern States* "prevailing market rate for comparable [loans]". *In re Southern States*, 709 F.2d at 653. This is so because a reading of *Hollinger* reveals no factual basis on which the *Hollinger* court could have based three to five percent above the five year treasury bill rate as the risk premium. All that is used to justify the range of risk premium is reference to a survey of risk premium ranges used by other bankruptcy courts in other cases summarized in *In re Valenti*, 105 F.3d at 64, as one to three percent, a statement that this range "may" be to low to protect the *Hollinger* case creditor, an assertion that the value of a used vehicle declines faster than other collateral, and

that one to three percent leaves no leeway for risk premiums for collateral with more risk. It, therefore, concludes with the contention that "the risk premium for used vehicles should be three to five percent." *In re Hollinger*, 245 B.R. at 697. This is no evidentiary fact supporting the three to five percent range set forth in the *Hollinger* opinion. Certainly "judicial notice" cannot fill the void.

This Court is more troubled by the Bankruptcy Court's adoption of the *Hollinger* formula of the five year treasury bill rate plus a three to five percent risk premium as a "one formula fits all" approach. As with the *Rash* rejection of a split-the-difference formula for the § 506(a) valuation portion of § 1325(a)(5)(B)'s cramdown determination, a one formula fits all approach for the interest rate factor for discounting payments over time to the § 506(a) valuation as of confirmation is equally wrong. The reason is basic: it predetermines a range of risk premiums based on factors assumed to be the same in all cases. This is not how a prevailing market rate for comparable loans is determined. *Southern States* clearly recited others, and the *Hollinger* court's opinion indicates its awareness of the others cited in *Southern States*. Regrettably, it did not take them into account. For instance, there may be wide variations in the quality of one's collateral and, even among debtors in bankruptcy, extremes in the risk of default. Also, use of a formula with a predetermined risk premium range for all cases set as of one date without reference to the evidentiary facts of cases which occur at a later date is improper for the same reason the *Southern States* court concluded the rate set for a 23 month period for unpaid federal taxes was not the prevailing market rate: each is fixed at one time as the market rate for other times without reference to interim changes in the factors used to set the rate of inter-

est. *See Southern States*, 709 F.2d at 651–52. Again, a compounding of errors has occurred. No evidence supports the use of the *Hollinger* formula in this case and *Hollinger* is a case using a formula with a risk premium range adopted in an evidentiary void. For these reasons, the Bankruptcy Court's interest rate determination in this case must be vacated.

The valuation issues discussed by this Court have so far been in the context of the interplay of bankruptcy law and the law of evidence. There is a further difficulty with the Bankruptcy Court's valuation procedure. Although it gives the appearance of comporting with "due process" requirements of the Constitution, it does not. Use of an arbitrarily selected, cookie-cutter approach to valuation, coupled with the court's reliance on a motion to value that contains no facts offered in support and that have any evidentiary weight, as the basis for granting the motion to value and valuing collateral, cannot be considered within what courts have traditionally considered a hearing that comports with due process requirements.

### C. Preclusive Effect of Confirmed Chapter 13 Plan

■ So far, this Court has avoided discussion of the impact of the Bankruptcy Court's confirmation order on the ability of Debtor to contest EvaBank's secured claim. Since EvaBank had filed a properly completed proof of claim before confirmation of Debtor's chapter 13 plan and the plan as confirmed expressly provided that its claim was fully secured and would be paid interest at the contract rate, EvaBank argues that its secured claim's status may not be altered post-confirmation by the Motion to Determine Value.

EvaBank's legal position is set on the foundation of 11 U.S.C. § 1327(a), that provides *inter alia:* "The provisions of a

confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan." Facially, this statutory provision is un-equivocal in its statement that the plan confirmed in Sunny Baxter's chapter 13 case is binding both on her and on her creditors such as EvaBank. This clarity has not, thus far, prevented its meaning from being the subject of litigation. In the Eleventh Circuit, disputes have arisen over the preclusive effect of a confirmed plan. In *In re Justice Oaks II, Ltd.,* 898 F.2d 1544, 1550 (11th Cir.1990), a case involving a confirmed chapter 11 plan, the Eleventh Circuit has held that a confirmation order may satisfy the requirements for claim preclusion. Lower courts in the Eleventh Circuit have similarly concluded. *See, e.g., In re Jones,* 271 B.R. 397, 401 (Bankr. S.D.Ala.2000); *In re Euler,* 251 B.R. 740, 746 (Bankr.M.D.Fla.2000). Courts which have considered this issue in other juris-dictions have likewise determined that a plan confirmation order may have preclu-sive effect. *See, e.g., Adair v. Sherman,* 230 F.3d 890, 894–895 (7th Cir.2000); *In re Deutchman,* 192 F.3d 457, 461 (4th Cir. 1999); *In re Snow,* 270 B.R. 38, 40–42 (D.Md.2001).

In the context of treatment of a secured claim under a confirmed chapter 13 plan, resolution of the preclusive effect of the confirmation order has been muddled by different methods by which plans are con-firmed by bankruptcy courts. Some such as that involved in this case do an Early Confirmation—one done prior to the time by which claims of creditors are required to be filed—and others confirm after the last date by which creditor's claims are to be filed, Late Confirmation. The distinc-tion drawn by some courts is that for Early Confirmation cases where claims have not been filed, the confirmation order should not have a preclusive effect since the creditors need not have filed claims by this point in time. *See In re Grogan,* 158 B.R. 197, 199–201 (Bankr.E.D.Ca.1993); *In re Linkous,* 141 B.R. 890, 898 (W.D.Va. 1992), *aff'd,* 990 F.2d 160 (4th Cir.1993)("[i]ssues that were not mature for decision and could not be appropriately resolved in either the confirmation hearing or in the order confirming the plan are not barred"). Also, some courts rely on 11 U.S.C. § 502(j) which, in pertinent part, provides that "[a] claim that has been al-lowed or disallowed may be reconsidered for cause. A reconsidered claim may be allowed or disallowed according to the eq-uities of the case. . . ." This subsection is asserted to allow a court to reconsider a claim after confirmation and, therefore, prevent a confirmation order from having claim preclusive effect. *See County Fuel Co., Inc. v. Equitable Bank Corp.,* 832 F.2d 290, 292 (4th Cir.1987)("a claim allowed by order may be later disallowed upon recon-sideration. 11 U.S.C. § 502(j)"); *In re Coleman,* 200 B.R. 403, 406 (Bankr.S.D.Ala.1996)(defendant's position that confirmation of a chapter 13 plan binds a debtor forever was incorrect be-cause debtors may seek reconsideration of any allowed claim "according to the equi-ties of the case" under 11 U.S.C. § 502(j)).

Because of the law of this Circuit and its *stare decisis* impact, this Court need not concern itself with these arguments. In *Justice Oaks,* the Eleventh Circuit deter-mined that a bankruptcy court's order con-firming a chapter 11 plan satisfied all of the four essential elements of claim preclu-sion. In reaching this holding, the Elev-enth Circuit reviewed 11 U.S.C. § 502(a)'s language providing that a claim is deemed allowed unless a party in interest objects and Rule 3007 of the FED. R. BANKR. PRO. setting forth the procedure for objecting to a proof of claim. The court realized that

Rule 3007 did not set a time period within which an objection to a claim had to be made. *Justice Oaks*, 898 F.2d at 1553. What is at the heart of this Court's ruling on claim preclusion in this case is the time frame within which an action needs to be taken to contest the secured status of a claim filed pre-confirmation in a chapter 13 case. It is precisely what is considered in *Justice Oaks*. In its adoption of the Fifth Circuit's position on this matter as set forth in the opinion of *In re Simmons*, 765 F.2d 547 (5th Cir.1985), the Eleventh Circuit said:

> The Fifth Circuit, however, has found such a deadline implicit in several provisions of the Code. In *Simmons v. Savell*...the court considered an objection, filed after confirmation of a plan, to a secured claim. Although the plan was a chapter 13 plan, most of the court's reasoning is applicable to confirmation of chapter 11 plans. The court held that "under section 506(a) [which applies to chapter 11 proceedings], a proof of secured claim must be acted upon—that is, allowed or dis-allowed—before confirmation of the plan or the claim must be deemed allowed for purposes of the plan. See 11 U.S.C. § 502(a)" ...The court went on to hold that "because no objection was filed before confirmation of [the] plan, [the] claim should have been deemed an allowed secured claim for purposes of confirmation." While there is some dispute over the breadth of the *Simmons* court's holding, we think that it at least stands for the proposition that, when the objection is based on an argument that the plan misclassified the objectionable claim, the objection must be made prior to confirmation of the plan.

*In re Justice Oaks*, 898 F.2d at 1553 [citations omitted]. The *Justice Oaks* panel went on to expressly hold that the *Simmons* ruling applies in a chapter 11 case and set forth that "[u]nder the rule of *Simmons*, which we adopt today as characterized above", the party objecting to a claim lost the right to object when the bankruptcy court confirmed the plan. *In re Justice Oaks*, 898 F.2d at 1553.

What is important about this portion of the *Justice Oaks* opinion is that it demonstrates that the Eleventh Circuit adopted its rule regarding the time by which a party must object to a claim filed before confirmation of a plan by embracing the Fifth Circuit's rule from a chapter 13 case. That is just the type of confirmed plan before this Court: Sunny Baxter's confirmed chapter 13 plan. The conclusion is inescapable. The time by which Sunny Baxter, the chapter 13 trustee, or any other party in interest, had to object to EvaBank's proof of claim was no later than just prior to entry of the confirmation order. For this reason, the later re-consideration of EvaBank's secured claim and the interest to be paid thereon could not be attacked post-confirmation by the Motion to Determine Value which in this case is, in reality, simply an objection to the classification of the claim under a different name.[8]

Because EvaBank's claim was filed before confirmation of Debtor's chapter 13 plan, this Court need not consider the impact of Early Confirmation when a creditor has not filed its claim. This is not what happened here. What happened in this case is within both the facts and law of *Justice Oaks* and its adoption of the time within which an objection must be made to a claim filed prior to confirmation of a

---

**8.** This Court is not unmindful of the *Fareed* court's contention that valuation of collateral is not an objection to a claim. *In re Fareed*, 262 B.R. at 764–65. However, this view is in conflict with the Eleventh Circuit's position in *Justice Oaks*.

plan. Accordingly, the Bankruptcy Court must be reversed and judgment entered in favor of EvaBank setting the value of its collateral and the interest rate to be paid on its claim as that set forth in its proof of claim and the chapter 13 plan as confirmed: $6,324.34 and 12.9%.

## IV. CONCLUSION

If this Court were Congress it might or might not write the Bankruptcy Code as Congress wrote it. However, the function of this Court is not to give either debtors or creditors more protection than Congress gave them. Neither is it the function of the courts to provide short cuts or ways of resolving disputes that avoid the difficulties created by having to comply with the Bankruptcy Code and with due process.

In accordance with the foregoing, the order of the Bankruptcy Court, insofar as it purports to establish the value of EvaBank's collateral and the interest rate to be paid by Debtor is **VACATED**, and because no purpose would be served by remanding the case, judgment is hereby entered **DECLARING** that the value of EvaBank's collateral is $6,324.34 and the interest rate to be paid by Debtor to EvaBank is 12.9% per annum.